In re Joseph S. EVANS, Linda B. Evans, Debtors.

No. 04–03288–8–JRL.

United States Bankruptcy Court, E.D. North Carolina, Wilson Division.

April 15, 2005.

---

Walter L. Hinson, John G. Rhyne, Hinson & Rhyne, P.A., Wilson, NC, for Debtors.

## *ORDER*

J. RICH LEONARD, Bankruptcy Judge.

This matter is before the court on the motion to determine rights to tobacco transition payments under the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"). On April 7, 2005, the court conducted a hearing on this matter in Wilson, North Carolina.[1]

## *BACKGROUND*

FETRA comprises part of the American Jobs Creation Act of 2004, which was signed into law by the President on October 22, 2004. Pub.L. No. 108–357. On April 4, 2005, three days prior to this hearing, the United States Department of Agriculture issued its Final Rule regarding the Tobacco Transition Payment Program. 70 Fed.Reg. 17150 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464). FETRA repeals the tobacco marketing quota and related price support programs authorized by Title III of the Agricultural Adjustment Act of 1938 and the Agricultural Act of 1949. *Id.* at 17150. It also provides for transitional payments to tobacco quota holders and producers. *Id.* Those eligible will receive tobacco transition payments in the fiscal years of 2005 through 2014. *Id.* Payments, however, are not automatic. *Id.* There is a program enrollment period between March 14, 2005 and June 17, 2005. *Id.* at 17156. In addition, persons identified in Farm Service Agency (FSA) records as quota holders or

---

**1.** Because of the importance of these issues to a number of cases, the court invited any interested party to file an amicus brief and appear at the hearing.

producers can submit a claim between March 30, 2005 through May 31, 2005. *Id.* While late applications will be accepted, a person submitting an application after June 17, 2005 will not receive the 2005 tobacco transition payment. *Id.*

## ANALYSIS

In the case at bar, the debtors are farmers of tobacco who anticipate tobacco transition payments based upon their status as both quota holders and producers. On April 22, 2004, the debtors filed for relief under Chapter 11. At the time of filing, the debtors owned certain tracts of land and tobacco quota. In addition, the debtors produced tobacco based on leasehold interests.

1. *Whether Tobacco Transition Payments Are Property of the Estate*

■ The initial issue before the court is whether the tobacco transition payments to be received by the debtors are property of the bankruptcy estate. Pursuant to 11 U.S.C. § 541(a), the commencement of the bankruptcy case creates an estate, and the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." As a general rule, property not owned by the debtor at the commencement of the case but acquired thereafter is not property of the bankruptcy estate. *American Bankers Ins. Co. of Fla. v. Maness,* 101 F.3d 358, 362 (4th Cir.1996). However, there are various exceptions to this rule, two of which are potentially applicable here. The estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." § 541(a)(6). It also includes "[a]ny interest in property that the estate

acquires after the commencement of the case." § 541(a)(7).

■ The term "proceeds," as set forth in § 541(a)(6), is not defined in the Bankruptcy Code, but the House and Senate Committee reports accompanying the enactment of the Bankruptcy Code indicate that the term "proceeds" is not limited to the Uniform Commercial Code definition but is to be construed broadly "to encompass all proceeds of property of the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 367–68 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 82–83 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6322–24, 5787, 5868–69; *American Bankers Ins. Co. of Fla. v. Maness,* 101 F.3d 358, 363 (4th Cir.1996); 5 COLLIER ON BANKRUPTCY § 541.17 (15th ed. rev.)(stating "anything that would be included under the U.C.C. definition will also be encompassed by section 541(a)(6), but the scope of section 541(a)(6) is not limited to that definition and will extend beyond it").

A. *Payments to Debtors as Quota Holders*

■ The first sub-issue is whether tobacco transition payments are property of the estate based upon the debtors' status as tobacco quota holders. Section 621 of FETRA defines "tobacco quota holder" as "a person that was an owner of a farm as of the date of enactment of this title, for which a base tobacco farm marketing quota or farm acreage allotment for quota tobacco was established for the 2004 tobacco marketing year." Pub.L. No. 108–357. Thus, one must own a farm with an established tobacco quota for 2004 to be eligible for payments as a quota holder. Clearly, the debtors' tobacco quota was a valuable and identifiable property right that they owned at the time of filing bankruptcy. *Copley v. Elliot,* 948 F.Supp. 586, 587 (W.D.Va.1996)(tobacco allotments are valu-

able property rights that can be bought, sold or leased). The express language of FETRA supports the position that the value of the tobacco quota is being replaced by the tobacco transition payments. Section 622(a) of FETRA, entitled "Contract Offered", states:

> The Secretary shall offer to enter into a contract with each tobacco quota holder under which the tobacco quota holder shall be entitled to receive payments under this section *in exchange for* the termination of tobacco marketing quotas and related price support under the amendments made by sections 611 and 612. The contract payments *shall constitute full and fair consideration* for the termination of such tobacco marketing quotas and related price support (emphasis added).

Pub.L. No., 108–357. The language of the accompanying regulations further clarifies that the payments are to compensate quota holders for the lost value of their tobacco quota, stating:

> The continued decline of quotas cast doubt on the continued viability of the quota and price support system, and elicited nationwide support for repeal of the statutory authority for the program and for *compensation* for the lost value of tobacco quotas.

70 Fed.Reg. 17150, 17156 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464)(emphasis added). In addition, the records of congressional debates support that Congress intended to compensate farmers for their tobacco quota, actually referring to it as a "buyout." *See* 108 CONG. REC. H495 (daily ed. Feb. 11, 2004)(statement of Rep. Graves)("I rise in support of tobacco buyout legislation ... A buyout would end the tobacco quota system, and a number of tobacco farmers, particularly the older ones, will cease to grow tobacco. Many quota holders and growers have invested a considerable amount of money in the current tobacco program over the years. They deserve compensation for their loss, and that compensation can come from tobacco"); 108 CONG. REC. H8724 (daily ed. Oct. 7, 2004)(statement of Rep. Kind)("While I support the buyout for tobacco farmers, which will help hardworking farmers in Wisconsin, I am disappointed that the bill does not include a Senate provision giving the Food and Drug Administration authority to regulate tobacco"); 108 CONG. REC. E2182 (daily ed. Dec. 7, 2004)(statement of Rep. Graves)("As a compromise, we agreed to a buyout that provides tobacco quota holders $7 per pound on their allotment paid out in equal installments over 10 years").

The debtors owned farm land and tobacco quota at the commencement of the action, which became property of the bankruptcy estate under § 541(a)(1). Given the express language of FETRA, the accompanying regulations, and the broad definition of proceeds, the tobacco transition payments are undoubtedly proceeds of the debtors' tobacco quota, pursuant to § 541(a)(6). The court finds that the tobacco transition payments to be received by debtors as quota holders are property of the bankruptcy estate.[2]

---

**2.** This conclusion is bolstered by the projected tax treatment of the tobacco transition payments. Tax implications for quota holders and producers will be different. *See* Arnold W. Oltmans, *Tax Implications of Tobacco Quota Buyout*, North Carolina State University College of Agriculture and Life Sciences Buyout Information Website (visited April 13, 2005) <http://www.cals.ncsu.edu:8050/advancement/tobaccobuyout>. The production payment "will be taxed as ordinary business income;" whereas, the quota payment "will be taxed as capital gain income." *Id.; see also* Daniel Osborne, *Tobacco Buyout Carries Tax Implications*, SOUTHEAST FARM PRESS, March 17, 2005 (visited April 13, 2005)

### B. *Payments to Debtor as Producer*

■ The second sub-issue is whether tobacco transition payments to be received by debtors as producers are property of the bankruptcy estate. Section 623(a) of FETRA, which addresses contract payments for producers of quota tobacco, states that the "producer of quota tobacco shall be entitled to receive payments under this section *in exchange for* the termination of tobacco marketing quotas and related price support under the amendments made by sections 611 and 612." Pub.L. No. 108–357 (emphasis added). Moreover, those contract payments *"shall constitute full and fair consideration* for the termination of such tobacco marketing quotas and related price support." *Id.* (emphasis added). While this language is identical to that addressing contracts with quota holders, the standard of eligibility for the program is different for quota holders and producers. As noted above, to be eligible for payments as a quota holder, one must have owned a farm with established tobacco quota for 2004. Thus, the debtors as eligible quota holders brought an identifiable property interest of farm and tobacco quota ownership to the table when filing bankruptcy, which became property of the bankruptcy estate. On the other hand, to be eligible for payment as a producer, one must have shared in the risk of producing tobacco. Section 621 of FETRA defines "producer of quota tobacco" as "an owner, operator, landlord, tenant, or sharecropper that *shared in the risk of producing tobacco* on a farm where tobacco was produced or considered planted pursuant to a tobacco farm poundage quota or farm acreage allotment established under part I of subtitle B of title III of the Agricultural Adjustment Act of 1938." Pub.L. 108–357 (emphasis added). Section 1463.102 of the regulations defines to "share in the risk of production" as "having a direct financial interest in the successful production of a crop of tobacco through ownership of a direct share in the actual proceeds derived from the marketing of the crop, which share is conditional upon the success of that marketing." 70 Fed.Reg. 17150, 17159 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464). Moreover, an eligible producer must have shared in the risk of production for the 2002, 2003 or 2004 marketing years. *Id.*

At the time of filing bankruptcy, the debtors' 2002 through 2003 risk of production was not a readily discernable interest. Unlike tobacco quota, which had a known pre-petition value, "risk of production" was simply the standard chosen by Congress for calculating payments to producers under FETRA that did not exist until October 22, 2004. Because the shared risk of production for 2002 through 2003 was not an identifiable property interest at the commencement of the action, it did not come into the bankruptcy estate under § 541(a)(1).[3] It follows that, because the 2002–2003 risk of production did not become property of the estate, the expected payments based upon the debtors' risk of production for 2002 through 2003 are not "proceeds" of property of the estate, pursuant to § 541(a)(6).

<http://southeastfarm-press.com/news/031705–Tobacco–taxes/>. (stating payments to quota holders will be taxed as capital gains, while payments to producers will be taxed as ordinary income).

**3.** At oral argument, creditor counsel cleverly attempted to characterize the interests of producers as residual rights flowing from expired leases of quota. However, nothing else appearing, tobacco allotments are a species of real property running with the land, and 11 U.S.C. 541(b)(2) expressly excludes from the estate "any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated ... before the commencement of the case...."

These facts are strikingly similar to the case of *In re Schmitz*, 270 F.3d 1254 (9th Cir.2001), where a fisherman filed a Chapter 7 petition a year and a half before the United States Secretary of Commerce issued regulations creating fishing quota shares. While the quota shares were acquired post-petition, they were based upon the pre-petition 1988–1990 catch history of the debtor. The Ninth Circuit held that the quota shares were not property of the bankruptcy estate. *Id.* at 1256–1257. It reasoned that, as of the date of the petition, the debtor's 1988–1990 catch history had no value, and the debtor had no more than "a hope or expectation that fishing quota regulations would be enacted and that he would qualify for whatever was promulgated." *Id.* at 1257. The pre-petition catch history, like the 2002–2003 risk of production, was not property of the estate; rather, it was simply the government's chosen reference for calculating payments under the program. *Id.* at 1258; *see also In re Vote*, 276 F.3d 1024, 1027 (8th Cir.2002)(pre-petition 1999 crop loss, which was the government's reference for determining eligibility for payments under disaster relief programs created post-petition, was not property of the estate). The Eighth Circuit in *Vote* noted "[w]e have found no case in which a pure loss with no attendant potential benefit was included as property of the estate." *Id.* at 1027.

The outcome is different for payments relating to the 2004 risk of production. As noted above, § 541(a)(7) reaches "any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). A Chapter 11 estate includes more than property; rather, the Chapter 11 estate "is more properly thought of as an enterprise continuing to operate during the pendency of the bankruptcy case." *Reed v. Yochem*, 184 B.R. 733, 739 (Bankr.W.D.Tex.1995);

*In re Herberman*, 122 B.R. 273, 278–279 (Bankr.W.D.Tex.1990); *see also Wade v. Bailey*, 287 B.R. 874, 880–881 (S.D.Miss. 2001)("[The estate] is an active legal enterprise comprised of its property, to be sure, but also of what the property generates while operating under the aegis of the Bankruptcy Code"). "[A]ll property interests generated by the estate enterprise logically fit into § 541(a)(7) as property acquired by the estate during the pendency of the bankruptcy." *Reed*, 184 B.R. at 739. Thus, the precise issue under § 541(a)(7) is whether the property interest in question can be "properly classified as a property interest generated by the estate enterprise." *Reed*, 184 B.R. at 740. Upon the debtors filing bankruptcy on April 22, 2004, the Chapter 11 estate came into being as a separate legal entity. *Wade*, 287 B.R. at 880. The debtors, as debtors-in-possession operating and working for the estate, completed an entire growing and harvesting cycle of crops. *See Reed*, 184 B.R. at 739 (stating the "chapter 11 debtor wears two hats, both commanding (as trustee) and working for the bankruptcy estate enterprise"); 11 U.S.C. §§ 1101, 1107, 1108. The bankruptcy estate bore any risk of production regarding those 2004 crops. It follows that, on October 22, 2004 when FETRA was signed into law, the bankruptcy estate acquired whatever right or interest the 2004 risk of production then provided. Thus, this court finds that the anticipated tobacco transition payments tied to the 2004 risk of production are after-acquired property of the bankruptcy estate, as they are a property interest generated by the estate. In contrast, because the risk of production for 2002 and 2003 did not come into the bankruptcy estate as a discernible right or interest at the commencement of the action and was never born by the bankruptcy estate, payments anticipated by the debtors as producers for 2002 and

2003 are not after-acquired property of the estate under § 541(a)(7).

### 2. *Whether Payments are Subject to Liens of Creditors*

■ The next issue is whether the tobacco transition payments are subject to the liens of creditors. Section 1463.111 of the USDA's Final Rule, entitled "offsets and assignment," states as follows:

TTPP payments made to any person under this subpart *shall be made without regard to questions of title under State law and without regard to any claim or lien* against the tobacco quota, tobacco marketing allotment, or the farm for which a tobacco quota had been established under part 723 of this title by any creditor or any other person.

70 Fed.Reg. 17150, 17165 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464)(emphasis added). Regarding preemption, the regulations state:

This final rule preempts State laws that are inconsistent with its provisions, but the rule is not retroactive. Before any judicial action may be brought concerning this rule, all administrative remedies must be exhausted.

70 Fed.Reg. 17150, 17157 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464). Moreover, the "Tobacco Transition Payment Quota Holder Contract" and the "Tobacco Transition Payment Producer Contract" both contain language stating "[A]ny payment due any participant will be made by CCC without regard to any question of title under State law, and without regard to any claim or lien which may be asserted by a creditor, except agencies of the U.S. Government." In addition, Notice TB–1124, issued March 1, 2005, by the USDA states that "[L]iens or mortgages held by financial institutions on farms with tobacco quota attached do not apply to TTPP payments."

Moreover, the regulations specify that a quota holder or producer may assign a payment to a third party or enter into a successor in interest contract but only at the approval of the CCC. The pertinent language, set forth at §§ 1463.111–1463.112 states:

A quota holder or tobacco producer who is eligible to receive a payment under this part may assign a payment, or a portion thereof, to be made under this part to another person using the correct CCC form. Such an assignment will become effective upon approval by CCC. In order to provide for orderly issuance of payments under this part, CCC may limit, in its sole discretion, the number of assignments that may be made with respect to a contract.

A quota holder or tobacco producer who is eligible to receive a payment under this part, and for whom a claim has not been established by the United States, may enter into a successor in interest contract with another party using the correct CCC form. Such successor in interest contract will become effective upon approval by CCC, and will not include the 2005 payment. Only one such successor in interest contract may be entered into by a quota holder or tobacco producer with respect to a farm for each kind of tobacco.

70 Fed.Reg. 17150, 17165 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464).

A reading of the above language can lead one to conclude either: (1) the government is abrogating any claim or lien that a creditor might have against the tobacco transition payments under state law; or (2) the government is deliberately taking a "hands off" approach so that it does not needlessly entangle itself in disputes between payees and creditors. The Fifth Circuit has addressed comparable

language in the Federal Crop Insurance Act (FCIA) and its accompanying regulations related to crop insurance proceeds. *In re Cook*, 169 F.3d 271 (5th Cir.1999). It held that after crop insurance proceeds are paid to a debtor, state law applies allowing a creditor to enforce its lien. *Id.* at 276. The applicable language of the FCIA states, in pertinent part:

> Claims for indemnities under this chapter shall not be liable to attachment, levy, garnishment, or any other legal process before payment to the insured or to deduction on account of the indebtedness of the insured or the estate of the insured to the United States except claims of the United States or the Corporation arising under this chapter.

7 U.S.C. § 1509. Regarding preemption, the FCIA states:

> State and local laws or rules shall not apply to contracts, agreements, or regulations of the [FCIC] or the parties thereto to the extent that such contracts, agreements or regulations provide that such laws or rules shall not apply, or to the extent that such laws or rules are inconsistent with such contracts, agreements, or regulations.

7 U.S.C. § 1506(*l* ). In addition, the pertinent regulation states:

> [n]o state or local governmental body or non-governmental body shall have the authority to promulgate rules or regulations, pass laws, or issue policies or decisions that directly or indirectly affect or govern agreements, contracts, or actions authorized by this part unless such authority is specifically authorized by this part or by the [FCIC].

7 C.F.R. § 400.352. The regulations further specify certain actions that state or local governments are prohibited from taking, including to: "impose or enforce liens, garnishments, or other similar actions against proceeds obtained, or payments issued in accordance with the Federal Crop Insurance Act, these regulations, or contracts or agreements entered into pursuant to these regulations." *Id.* In addition, at the time of the *Cook* case, there was a regulatory provision stating that an interest in an insured crop existing by a lien "shall not entitle the holder of the interest to any benefit under the contract." *Cook*, 169 F.3d at 275 (formerly at 7 C.F.R. § 401.5). Also, the debtor could assign the right to indemnity, but the assignment had to be on the FCIC's form and approved in writing by the FCIC. *Id.* at 275 (formerly at 7 C.F.R. § 401.8). The Fifth Circuit, taking all of this language into consideration, concluded that neither the statute nor its accompanying regulations expressed an intent to preempt state law governing issues between the debtor and creditor after the debtor's receipt of the proceeds. *Id.* at 276; *see also In re Rees*, 216 B.R. 551 (Bankr.N.D.Tex.1998)(holding that the FCIA does not preempt creditor's state law lien rights under the UCC).

Similarly, in *In re Arnold*, 88 B.R. 917, 921 (Bankr.N.D.Iowa 1988), the court considered regulatory language applicable to commodity certificates and concluded that the regulations did not preempt state law on secured transactions. In that case, the debtors received a generic commodity certificate from the Commodity Credit Corporation, and the debtors argued that a creditor had no secured interest in the certificate because the applicable federal regulations prohibited the assignment of the certificate and the applicability of any liens. *Id.* at 920. At the time of the court's decision, the applicable regulations provided:

> Commodity certificates shall not be subject to any lien, encumbrance, or other claim or security interest except that of an agency of the United States Govern-

ment arising specifically under Federal statute.

*Arnold,* 88 B.R. at 920 (formerly at 7 C.F.R. § 770.4(b)(2)).

> "[N]otwithstanding any other provision of this chapter, a payment made under this part may not be the subject of an assignment, except as determined and announced by the CCC."

*Arnold,* 88 B.R. at 920(formerly at 7 C.F.R. § 770.6). The face of the certificate also contained that regulatory language. *Id.* The *Arnold* court adopted the rationale set forth in *Security Bank & Trust Co. v. Case (In re George),* 85 B.R. 133, 138–43 (Bankr.D.Kan.1988), which also considered 7 C.F.R. § 770.4(b)(2), and held that the regulation could not be used by a debtor to avoid a properly perfected security interest. The court in *George* concluded that "[i]n the absence of a clear Congressional mandate to preempt state law" it would not "tread upon the intricate state law upon which private parties base their every day commercial transactions." *Id.* at 141.

In *In re Sunberg,* 729 F.2d 561 (8th Cir.1984), the Eighth Circuit considered earlier regulations related to payment-in-kind programs, which then read:

> (e) Assignments with respect to quantities of a commodity which can be received by a producer as payment in kind will be recognized by the Department [of Agriculture] only if such assignment is made on Form CCC–479, Assignment of Payment–in–Kind, executed by the assignor and assignee, and filed with the county committee.
>
> (f) Except as provided in paragraph (e) of this section, any payment in kind or portion thereof which is due any person shall be made without regard to questions of title under State law, and without regard to any claim of lien against the commodity, or proceeds thereof, which may be asserted by any creditor.

*Sunberg,* 729 F.2d at 563 (quoting 48 Fed. Reg. 9235 (1983)). The Eighth Circuit concluded that the regulations did not restrict program beneficiaries from voluntarily encumbering their benefits under state law. *Sunberg,* 729 F.2d at 563. In making its holding, the court stated that such regulatory provisions "are intended to insulate the government as benefit provider from conflicting claims over payments, not to preempt state commercial law as between third parties." *Id.* at 563.

■ In the case at bar, it is significant that the Act itself does not address the treatment of creditors' claims or liens against the tobacco transition payments. Regarding regulations to accompany the statute, § 642 of FETRA states: "The Secretary may promulgate such regulations as are necessary to implement this title and the amendments made under this title." Pub.L. 108–357. Nowhere in FETRA does it give the Secretary of Agriculture the authority to strip away the rights of creditors under state law, nor is there a pervasive scheme, need for uniformity, or danger of conflict between the enforcement of state and federal law that would warrant preemption. As worded in *Security Bank & Trust Co. v. Case (In re George),* "[b]ecause a federal agency has no inherent authority to preempt state law, Congressional intent to preempt must be clearly manifested." 85 B.R. 133, 140 (Bankr.D.Kan.1988). Where there is no evidence of Congressional intent, this court will not presume the invalidity of state law. While the regulations state that they preempt state law in conflict with their provisions, 70 Fed.Reg. 17150, 17157 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464), this court finds that the regulations can be enforced harmoniously with the state law rights of creditors.

When reading the regulatory provisions regarding offsets and assignments and

successor in interest contracts, the court agrees with the conclusion reached by the Eighth Circuit in *In re Sunberg,* 729 F.2d 561 (8th Cir.1984) that the provisions are in place for administrative ease. The government will pay the eligible quota holder or producer "without regard to questions of title under State law and without regard to any claim or lien against the tobacco quota" so that it does not have to bother with conflicting claims over payment. 70 Fed.Reg. 17150, 17165 (2005)(to be codified at 7 C.F.R. §§ 723, 1463–1464). By setting up a method of payment, the Secretary of Agriculture is not abrogating the rights of creditors under state law. There is no Congressional support for that interpretation. For this reason, the court concludes that once payment is made to an eligible debtor, that payment may be subject to the claims of creditors.

### CONCLUSION

For the foregoing reasons, the court finds that the anticipated tobacco transition payments to the debtors in their capacity as tobacco quota holders will come into the bankruptcy estate, pursuant to § 541(a)(6). Payments to be made to the debtors in their capacity as producers for the 2002–2003 risk of production do not constitute property of the bankruptcy estate. Payment to be made to the debtors-in-possession in their capacity as producers for the 2004 risk of production will come into the bankruptcy estate, pursuant to § 541(a)(7). Any payments made to the debtors as quota holders shall be subject to the claims of creditors under state law. Payments to the estate for the 2004 producer payments are free of prepetition liens.

**So Ordered.**