T-WOL ACQUISITION COMPANY, INC., TERENCE A. COLBERT, AND HAL H. HARRIS, PLAINTIFFS ECDG SOUTH, LLC; JOHN L. EDMONDS, ESQ. AND RUDOLPH CLARK, JR., CPA, DEFENDANTS

No. COA11-1244

(Filed 1 May 2012)

**1. Estoppel—judicial estoppel—inconsistent positions in prior and present actions—no abuse of discretion**

The trial court did not abuse its discretion in its application of the doctrine of judicial estoppel as to plaintiff Harris. Harris's failure to list on his bankruptcy petition his involvement and ownership interest in plaintiff T-WOL was inconsistent with the position that he took in this action. Thus, Harris was estopped from claiming any ownership interest in or position as an officer or director of T-WOL.

**2. Fiduciary Relationship—breach of fiduciary duty—sole shareholder of corporation—no duty owed to directors or officers**

The trial court did not err in dismissing plaintiff Colbert's claims of constructive fraud, civil conspiracy, usurpation of corporate opportunity, and unfair and deceptive trade practices, which were based on defendant Edmond's alleged breach of fiduciary duty due to the transfer of the disputed property. Edmonds, as the sole shareholder of plaintiff T-WOL, did not owe a fiduciary duty to the directors or officers of T-WOL and could dispose of the disputed property as he saw fit.

**3. Fiduciary Relationship—breach of fiduciary duty—sole shareholder of corporation—no duty owed corporation**

The trial court did not err by dismissing plaintiff T-WOL's claims of constructive fraud, civil conspiracy, usurpation of corporate opportunity, and unfair and deceptive trade practices, which were based on defendant Edmonds alleged breach of fiduciary duty. As defendant Edmonds was the sole shareholder of plaintiff of T-WOL, he did not owe a fiduciary duty to the corporation itself and could dispose of the disputed real property as he saw fit.

**4. Fiduciary Relationship—breach of fiduciary duty—alleged accountant for corporation—no duty owed**

The trial court properly dismissed plaintiffs' claims for breach of fiduciary duty, civil conspiracy, constructive fraud, and unfair and deceptive trade practices against defendant Clark. Clark, alleged to be the accountant for plaintiff T-WOL, did not owe any duty to T-WOL. Furthermore, plaintiffs' claims against defendant ECDG South, LLC were also properly dismissed as ECDG's only role in the lawsuit was that it was the company to which the disputed property was transferred, a transfer which was determined to be valid.

Appeal by plaintiffs from order and judgment entered 19 April 2011 by Judge Michael R. Morgan in Superior Court, Durham County. Heard in the Court of Appeals 8 March 2012.

*Shirley & Adams, P.L.L.C., by Ryan J. Adams, for plaintiffs-appellants.*

*Michaux & Michaux, P.A., by Eric C. Michaux, for defendants-appellees.*

STROUD, Judge.

"Oh what a tangled web we weave,

When first we practise to deceive!"

Sir Walter Scott, *Marmion*, Canto VI, Stanza 17.

Over a period of more than ten years, the parties to this case have woven this "tangled web" of claims and counterclaims. After carefully untangling the knots as best we can based upon the record before us and the applicable law, we affirm the trial's court's order granting summary judgment in favor of ECDG South, LLC, John L. Edmonds, and Rudolph Clark, Jr. ("defendants"), from which T-WOL Acquisition Company, Inc., Terence A. Colbert, and Hal H. Harris ("plaintiffs") have appealed.

I.  Factual Background

The weaving of this web of deception started sometime in the early 1990's, when defendant Edmonds began trying to develop low income housing on three parcels of real property ("the disputed property") located in Durham, North Carolina. Because defendant Edmonds lived in New York, he needed someone present in North

Carolina to assist him with this process. He first enlisted Gilford A. Finch for this purpose and Fair City-Pines Corporation was created to hold the disputed property, but the attempts of Mr. Finch and defendant Edmonds to develop the disputed property were unsuccessful and devolved into litigation, in manner quite similar to this lawsuit. Plaintiff T-WOL was created as part of defendant Edmonds' second attempt to develop the disputed property and this second attempt is the genesis of this lawsuit.

Based upon the affidavits, depositions, and documents filed with the parties' summary judgment motions, along with the parties' pleadings, it appears that in 1999 defendant Edmonds approached plaintiff Harris and asked for his assistance in developing low-income housing in Durham. For this purpose they formed T-WOL Acquisition Company, Inc. ("T-WOL") on 19 September 2000. On 25 October 2000, plaintiff Harris and defendant Edmonds were named as directors; 500 shares of T-WOL stock were issued to plaintiff Harris and 350 shares were issued to defendant Edmonds; defendant Edmonds was elected as president and plaintiff Harris as vice president and secretary; and the corporation adopted bylaws. Also on 25 October 2000, defendant Edmonds assigned to T-WOL his rights to "amounts loaned to Gilford A. Finch and Fair City-Pines Corporation" and "real property promised in payment thereof by Fair City-Pines Corporation . . . and Gilford A. Finch[,]" which arose from defendant Edmonds' first attempt to develop the same real property in Durham and the ensuing lawsuit, as discussed above.

One day later, on 26 October 2000, plaintiff Harris signed stock certificates purporting to transfer his 500 shares to plaintiff Colbert.[1] Despite the fact that plaintiff Harris had just transferred his stock to plaintiff Colbert, on 21 December 2000, defendant Edmonds and plaintiff Harris signed a stock assignment agreement which affirmed that defendant Edmonds and plaintiff Harris were the only shareholders of T-WOL. Only twenty days later, on 9 January 2001, plaintiff Harris filed for Chapter 7 bankruptcy protection claiming over $42 million in debts and $11,398.00 in assets. Plaintiff Harris did not disclose any interest in T-WOL or any transfer of stock in T-WOL on his bankruptcy petition. On 20 March 2001, Fair City-Pines Corporation transferred the disputed property by general warranty deed to T-WOL pursuant to the assignment by defendant Edmonds. On 13 June 2001, plaintiff Harris received a discharge of debt from the bankruptcy court.

---

1. Corporate records for T-WOL from 2000 to 2005 show that plaintiff Colbert was elected as a director and later as president, but the parties dispute the validity of these corporate records and elections, as discussed below.

T-WOL ACQUISITION CO., INC. v. ECDG S., LLC

[220 N.C. App. 189 (2012)]

About two years later, on 1 June 2003, plaintiff Colbert signed stock certificates transferring the 500 shares of T-WOL stock back to plaintiff Harris. About three years after this transfer, on 5 May 2005, the North Carolina Department of the Secretary of State administratively dissolved T-WOL "for failure to file an annual report[.]"

About seven years after plaintiff Harris's discharge in bankruptcy and three years after the administrative dissolution of plaintiff T-WOL, on 11 January 2008, defendant Clark filed articles of organization for ECDG South as a North Carolina limited liability company. On 24 April 2008, defendant Edmonds executed a special warranty deed as president of T-WOL transferring the disputed property to ECDG South, LLC. On 15 August 2008, defendant Edmonds as a member/manager of ECDG South LLC executed a deed of trust on the disputed property to obtain a loan for ECDG South LLC from NewBridge Bank.

Over a year after the transfer of the disputed property to ECDG South, LLC, on 22 April 2009, without advising defendant Edmonds of their plans to reinstate T-WOL, plaintiffs Colbert and Harris filed an application for reinstatement for T-WOL with the Secretary of State. After they had "caused all the back year tax returns and annual reports to be filed" the dissolution was cancelled and T-WOL was reinstated "effective as of the 5th day of May, 2005."

On 25 August 2009, plaintiffs filed a verified complaint against defendants alleging that defendant John L. Edmonds had wrongfully transferred real property from plaintiff T-WOL Acquisition Company, Inc. to defendant ECDG South, LLC and raising claims for breach of fiduciary duty, constructive fraud, civil conspiracy, usurpation of corporate opportunity, conversion, unfair and deceptive trade practices, specific performance to transfer real property back to plaintiffs, a declaratory judgment that the deed transferring the contested real property be null and void, and for punitive damages. On the same date, plaintiffs filed a notice of *lis pendens* describing the nature of the complaint and the real property involved. On 26 October 2009, defendants filed their answer denying plaintiffs' allegations, raising a motion to dismiss pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6), raising the affirmative defense of fraud, and requesting that plaintiffs' claims be dismissed with prejudice. About 16 months later, defendants obtained new counsel and on 23 February 2011, filed a motion to amend their answer to add counterclaims for judicial dissolution of T-WOL Acquisition Company, Inc., unjust enrichment, breach of fiduciary obligation, civil conspiracy, forgery, false pretenses, unfair and deceptive trade practices, and for punitive damages. Following a

T-WOL ACQUISITION CO., INC. v. ECDG S., LLC

[220 N.C. App. 189 (2012)]

hearing on defendants' motion on 7 March 2011, the trial court on 23 March 2011 entered an order allowing in part and denying in part defendants' motion, providing specifically as follows:

> 1. Defendants' Motion to Amend is allowed in part and denied in part.
>
>> a. To the extent the Amended Answer raises affirmative defense those defenses/amendments are allowed, including Breach of Fiduciary Obligation, Civil Conspiracy, Forgery, and False Pretenses.
>>
>> b. To the extent the Amended Answer attempts to seek affirmative relief through counterclaims/amendments [those] are denied, without prejudice.
>
> 2. Defendants can raise these denied amendments after the conclusion of the trial in this matter, either as equitable remedies, in a bifurcated trial, or in a new trial, at the discretion of the Trial Judge.
>
> 3. Defendants cannot pursue Discovery on their counterclaims until such time as those claims are raised.

On or about 1 April 2011, plaintiffs filed a motion for summary judgment, with supporting affidavits and documentation. Defendants filed affidavits with supporting documentation in response to plaintiffs' motion.

By order entered 19 April 2011, the trial court granted summary judgment in favor of defendants, ruling that

> as a result of the Court's application of judicial estoppel in its discretion on the issues of stock ownership and stock transfer, which estoppel arises from Plaintiff Harris's sworn statements in the aforementioned bankruptcy proceedings, *see Bioletti v. Biolette*, 693 S.E.2d 691 (N.C. App. 2010), and the Court being of the opinion, therefore, that summary judgment in favor of the Plaintiffs should be denied and Summary Judgment in favor of the Defendants should be granted[.]

The trial court entered summary judgment in favor of defendants, dissolved the *lis pendens*, and ordered that the corporate records for T-WOL be delivered to counsel for defendant Edmonds. Plaintiffs filed timely notice of appeal from the trial court's 19 April 2011 order.

## II. Summary judgment

The standard of review from a motion for summary judgment is well established:

> Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' N.C. Gen. Stat. § 1A-1, Rule 56(c). 'A trial court's grant of summary judgment receives *de novo* review on appeal, and evidence is viewed in the light most favorable to the non-moving party.' *Sturgill v. Ashe Memorial Hosp., Inc.*, 186 N.C. App. 624, 626, 652 S.E.2d 302, 304 (2007), *disc. review denied*, 362 N.C. 180, 658 S.E.2d 662 (2008).

*Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer*, ____ N.C. App. ____, ____, 705 S.E.2d 757, 764-65 (2011) (quoting *Liptrap v. Coyne*, 196 N.C. App. 739, 741, 675 S.E.2d 693, 694 (2009)), *disc. review denied*, 365 N.C. 188, 707 S.E.2d 243 (2011). Summary judgment is appropriate if "plaintiff[s] cannot surmount an affirmative defense which would bar the claim." *Gibson v. Mutual Life Ins. Co.*, 121 N.C. App. 284, 286, 465 S.E.2d 56, 58 (1996) (citation and quotation marks omitted).

Plaintiffs argue that the trial court erred in "granting summary judgment in favor of defendants[.]" Specifically, plaintiffs contend that (1) a material issue of fact existed as to plaintiffs' claims for breach of fiduciary duty, constructive fraud, civil conspiracy, usurpation of corporate opportunity, and unfair and deceptive trade practices; (2) declaratory judgment should have been entered in favor of plaintiffs; (3) the trial court erred in applying the doctrine of judicial estoppel; (4) the trial court erred in applying the law of resulting trust; and (5) the trial court erred in ordering T-WOL to surrender its records to defendants' counsel.

Defendants counter that the trial court's order should be affirmed as (1) plaintiff Harris is barred by judicial estoppel from claiming an ownership interest in T-WOL which makes defendant Edmonds the sole shareholder of T-WOL; (2) plaintiff Colbert is barred by the statute of limitations from claiming ownership of T-WOL stock; (3) the trial court correctly applied the doctrine of resulting trust as defendant Edmonds had "provided all the consideration for the acquisition and maintenance of [the disputed property;]" (4) plaintiff Colbert

"had no right to apply for reinstatement of the corporate status of T-WOL after its Administrative Dissolution in 2005[;]" (5) as the sole owner of T-WOL defendant Edmunds is entitled to the corporate records of T-WOL; (6) plaintiffs received defendants motion for summary judgment 13 days before the hearing, within the time permitted by Rule 56(c); and (7) claims against defendant Clark were properly dismissed because plaintiffs failed to show that they had any contract with defendant Clark. As the issue of judicial estoppel is dispositive, we address it first. Plaintiffs contend that the trial court erred in considering the doctrine of judicial estoppel and in the alternative, erred in its application of the doctrine.

A.  Shareholder derivative suit

Before addressing judicial estoppel, we must note that although plaintiffs have not referred to it as such, this lawsuit is essentially a derivative lawsuit, as both individual plaintiffs seek to redress alleged wrongs to the corporation, plaintiff TWOL, and to have the disputed property returned to T-WOL. Although the complaint requests recovery of damages for all of the "plaintiffs" without distinguishing between the rights of the corporation as opposed to the individual plaintiffs, and prays "[t]hat the Defendants be ordered to transfer the property back to *Plaintiffs*, free of any and all encumbrances and liens, pursuant to the [Declaratory Judgment] Cause of Action," all of the claims arise from the actions of the defendants in regard to plaintiff T-WOL and the disputed property.[2] (emphasis added.) We also note that defendants have not argued that this is properly a derivative lawsuit, or that plaintiffs have failed to allege the requisites of a derivative lawsuit.

> As a general rule, shareholders have no right to bring actions "in their [individual] name[s] to enforce causes of action accruing to the corporation[,]" *Fulton v. Talbert*, 255 N.C. 183, 185, 120 S.E.2d 410, 412 (1961), but must assert such claims derivatively on behalf of the corporation. *Robinson* § 17–2(a) at 333. A correct characterization of the shareholder's action as derivative or individual may be crucial, as there are certain mandatory procedural and pleading requirements for a derivative

---

2. For example, the complaint alleges that defendants Edmonds and Clark deliberately failed "to file the appropriate tax returns and annual reports" for T-WOL and that this action "underscores how Defendants Edmonds and Clark had conspired, against Plaintiffs, over a long period of time, to steal *T-WOL's Property*." There is no allegation that either individual plaintiff has ever had any ownership interest in the disputed property.

action. F.H. O'Neal & R. Thompson, *O'Neal's Oppression of Minority Shareholders* § 7:07 (2d ed. 2000), p. 52. Some procedural restrictions proceed from concerns about prevention of a multiplicity of lawsuits and concern over "who should properly speak for the corporation." *Id.* Other restrictions arise from concerns that derivative actions will be misused by " 'self-selected advocate[s]' pursuing individual gain rather than the interests of the corporation or the shareholders as a group, bringing costly and potentially meritless 'strike suits.' " *Id.*

Thus, for example, a shareholder who brings a derivative action in North Carolina must show that he or she "[f]airly and adequately represents the interests of the corporation in enforcing the right of the corporation[,]" N.C. Gen. Stat. § 55–7–41 (1999), and may not commence the action until written demand on the corporation's directors has been made and the statutory period has elapsed. N.C. Gen. Stat. § 55–7–42 (1999). Further, the corporation may then determine by a majority vote of "independent" directors that maintenance of the derivative action "is not in the best interest of the corporation." N.C. Gen. Stat. § 55–7–44(a)(b)(1) (1999). "Independent" directors may include persons who have been nominated or elected by persons who are defendants in the derivative action, persons who are themselves defendants in the derivative action, and persons who approve of the act being challenged. N.C. Gen. Stat. § 55–7–44(c)(1)(2)(3) (1999). "If the corporation commences an inquiry into the allegations set forth in the demand or complaint, the court may stay a derivative proceeding for a period of time the court deems appropriate." N.C. Gen. Stat. § 55–7–43 (1999). Finally, the derivative suit may not be settled without the approval of the court. N.C. Gen. Stat. § 55–7–45(a) (1999). It is of obvious importance to the parties that the recovery in a derivative action goes to the corporation, not to the plaintiff personally. *Outen v. Mical,* 118 N.C. App. 263, 266, 454 S.E.2d 883, 885 (1995).

*Norman v. Nash Johnson & Sons' Farms, Inc.,* 140 N.C. App. 390, 395-96, 537 S.E.2d 248, 253-54 (2000), *disc. review denied,* 353 N.C. 378, 547 S.E.2d 14 (2001). The primary purpose of this lawsuit is to restore the disputed property to plaintiff T-WOL; the only benefit to the individual plaintiffs is as shareholders in T-WOL. But since no party has addressed any issues as to the requirements for a derivative lawsuit under N.C. Gen. Stat. § 55-7-41 *et. seq.,* we shall not either, and

we express no opinion on these issues. But we do note that the first requirement of a derivative lawsuit, or any of the claims which plaintiffs have alleged, is to establish the identity of the shareholders of T-WOL, and these are the issues which the parties have argued at length. We will therefore examine the arguments actually raised, as these are dispositive.

B.  Judicial estoppel

**[1]**  Defendants claim that although Plaintiff Harris may nominally be a shareholder of T-WOL, he is judicially estopped from exercising any rights as a shareholder based upon his failure to identify his interest in T-WOL in his 9 January 2001 bankruptcy petition, in which he was required by law to identify this interest but he did not, and he obtained a discharge in bankruptcy. Thus, we must first consider whether plaintiff Harris, as a shareholder, is barred from participation in this action.

1.  Consideration

Plaintiffs argue that defendants should not have been allowed to present the affirmative defense of judicial estoppel as they did not plea this affirmative defense in their amended answer as required by N.C. Gen. Stat. § 1A-1, Rule 8(c). Plaintiffs also argue that since the trial court's prior 23 March 2011 order, regarding defendants' motion to amend, denied defendants' motion to add counterclaims and allowed certain affirmative defenses, not including judicial estoppel, the trial court erred in allowing defendants to "present the affirmative claim of judicial estoppel" in violation of its prior order.

Defendants contend that contrary to plaintiffs' arguments the trial court's 23 March 2011 order regarding the amendment of defendants' answer stated that defendants could not raise counterclaims but allowed them to "present any affirmative defenses[;]" defendants served their affidavit which addressed judicial estoppel in response to plaintiffs' motion for summary judgment; and pursuant to the trial court's 23 March 2011 order regarding defendants' motion to amend and N.C. Gen. Stat. § 1A-1, Rule 56(e), the trial court properly considered the affirmative defense of judicial estoppel.

N.C. Gen. Stat. § 1A-1, Rule 8(c) (2009) states that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . estoppel . . . and any other matter constituting an avoidance or affirmative defense." Generally, estoppel is an affirmative defense which must be plead with certainty. *Duke University v. St. Paul Mercury Ins. Co.,*

95 N.C. App. 663, 673, 384 S.E.2d 36, 42 (1989). "Broadly speaking, judicial estoppel prevents a party from acting in a way that is inconsistent with its earlier position before the court." *Powell v. City of Newton*, 364 N.C. 562, 569, 703 S.E.2d 723, 728 (2010) (citing *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 28-29, 591 S.E.2d 870, 888-89 (2004)). We note that defendants did not directly mention or allege facts that would raise the affirmative defense of judicial estoppel in their initial answer. Nor did defendants' proposed amended answer include the affirmative defense of judicial estoppel, although it did allege others. Therefore, defendants did not raise judicial estoppel as an affirmative defense in their pleadings. Contrary to defendants' argument, the trial court's 23 March 2011 order granting in part and denying in part defendants' motion to amend their answer did not permit defendants to raise "any affirmative defenses" but stated that defendants could raise their affirmative claims as affirmative defenses; barred defendants from making new counterclaims in their amended answer; but permitted defendants to raise their counterclaims at the end of the trial "either as equitable remedies, in a bifurcated trial or in a new trial, at the discretion of the Trial Judge." None of defendants' affirmative claims or counterclaims were based upon judicial estoppel.

Yet the failure to plead judicial estoppel does not end our inquiry, as "although the failure to plead an affirmative defense ordinarily results in its waiver, the parties may still try the issue by express or implied consent." *Id.* at 673, 384 S.E.2d at 42 (citation omitted). N.C. Gen. Stat. § 1A-1, Rule 15(b) (2009) provides as follows:

> When issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, either before or after judgment, but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues raised by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be served thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Our Supreme Court discussed the application of N.C. Gen. Stat. § 1A-1, Rule 15(b) as follows:

> [T]he implication of Rule 15(b) . . . is that a trial court may not base its decision upon an issue that was tried inadvertently. Implied consent to the trial of an unpleaded issue is not established merely because evidence relevant to that issue was introduced without objection. At least it must appear that the parties understood the evidence to be aimed at the unpleaded issue.

*Eudy v. Eudy*, 288 N.C. 71, 77, 215 S.E.2d 782, 786-87 (1975) (citations omitted), *overruled on other grounds in Quick v. Quick*, 305 N.C. 446, 457-58, 290 S.E.2d 653, 661 (1982). Here, on or about 1 April 2011, plaintiffs filed a motion for summary judgment pursuant to N.C. Gen. Stat. § 1A-1, Rule 56, with supporting documentation and affidavits, arguing that there was no genuine issue of material fact as the forecast of evidence showed that defendant Edmonds was not the sole shareholder of T-WOL when he transferred the contested real property, as plaintiff Harris and/or Colbert were also shareholders. Subsequently, defendants filed the "affidavit of John L. Edmonds, Esq. in response to plaintiff's [sic] motion for summary judgment" pursuant to Rule 56(e) and supporting documentation, which alleged that plaintiff Harris denied any ownership interest in T-WOL in his previous bankruptcy filings. The record shows that both parties argued extensively and specifically for and against the application of judicial estoppel at the 11 April 2011 hearing on plaintiffs' motion for summary judgment and plaintiffs made no objection to the consideration of judicial estoppel on the grounds that it was not included in defendants' pleadings. Therefore, by the "implied consent" of the parties, the trial court properly considered the doctrine of judicial estoppel. *See* N.C. Gen. Stat. § 1A-1, Rule 15(b).

2. Application

Plaintiffs argue next that the trial court erred in its application of the doctrine of judicial estoppel. Plaintiffs, citing *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 38, 591 S.E.2d 870, 894 (2004), argue that plaintiff Harris's position in this case is consistent with his position in the bankruptcy, as he did not own the T-WOL shares when he filed for bankruptcy and was not required to disclose the transfer of T-WOL shares, as it was done "in the ordinary course of business" to secure "a commitment [from plaintiff Colbert] to advance money in the future for T-Wol purposes[.]" Plaintiffs further argue that "there is no threat to judicial integrity" because plaintiff Harris had not "intent-

ionally misled the bankruptcy court" as he consulted with "multiple attorneys regarding his bankruptcy, including Edmonds[;]" and plaintiffs "will not gain an unfair advantage or cause an unfair detriment to Defendants by allowing [plaintiffs] to present evidence Edmonds was not the only share holder of T-Wol" because defendant Edmonds advised plaintiff Harris not to list "everything in his bankruptcy" and defendant Edmonds was listed as a creditor numerous times on defendant Harris's bankruptcy schedule.[3] Plaintiffs further argue that judicial estoppel should be applied to defendants as defendant Edmonds had stated in his affidavit that he was the sole shareholder of T-WOL but later acknowledged that he was not.

Defendants counter that the trial court did not abuse its discretion in applying judicial estoppel. Defendants argue that the undisputed facts establish that plaintiff Harris denied in his bankruptcy being an officer or director in the corporation, any ownership interest in T-WOL, or any transfer of T-WOL stock; in contrast plaintiffs' pleadings state that plaintiff Harris was the owner of T-WOL stock; despite the omission of T-WOL from his bankruptcy property listings, plaintiff Harris received the benefit of bankruptcy discharge; this omission was not inadvertent; and plaintiff Harris was properly judicially estopped from claiming an ownership interest in T-WOL.

We have recently summarized the doctrine of judicial estoppel as follows:

> Our Supreme Court first recognized the doctrine of judicial estoppel in *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 591 S.E.2d 870 (2004), and noted that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Id.* at 28, 591 S.E.2d at 888 (quotation omitted). The purpose of this doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]" *Id.* (quotation omitted). "[J]udicial estoppel forbids a party from asserting a legal position inconsistent with one taken earlier in the same or related litigation." *Price v. Price*, 169 N.C. App. 187, 191, 609 S.E.2d 450, 452 (2005). In *Whitacre P'ship*, our Supreme Court set forth three factors which may be considered in determining whether the doctrine is applicable:

---

3. Plaintiff Harris also concedes that defendant Edmonds was not his attorney in the bankruptcy matter and that he sought counsel from other attorneys before filing his bankruptcy petition.

First, a party's subsequent position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding might pose a threat to judicial integrity by leading to inconsistent court determinations or the perception that either the first or the second court was misled. Third, courts consider whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Whitacre P'ship*, 358 N.C. at 29, 591 S.E.2d at 888-89 (internal citations and quotations omitted). The first factor is the only factor that must be present for judicial estoppel to apply. *Wiley v. United Parcel Serv., Inc.*, 164 N.C. App. 183, 188, 594 S.E.2d 809, 812 (2004). . . . "[J]udicial estoppel is to be applied in the sound discretion of our trial courts." *Whitacre P'ship*, 358 N.C. at 33, 591 S.E.2d at 891.

*Estate of Means v. Scott Elec. Co.*, ____ N.C. App. ____, ____, 701 S.E.2d 294, 298-99 (2010). Our Supreme Court has further stated that judicial estoppel "seeks to protect the courts, not litigants, from individuals who would play 'fast and loose with the judicial system' " and is a "discretionary equitable doctrine . . . providing courts with a means to protect the integrity of judicial proceedings[.]" *Whitacre P'ship*, 358 N.C. at 26, 591 S.E.2d at 887.

In *Bioletti v. Bioletti*, 204 N.C. App. 270, 693 S.E.2d 691 (2010), this Court addressed the application of the doctrine of judicial estoppel to the plaintiff's claims in light of his inconsistent position in his prior bankruptcy proceeding. In *Bioletti*, the plaintiff filed a petition seeking relief under Chapter 7 of the Bankruptcy Code, alleging that he did not have any funds to pay his creditors. *Id.* at 270, 693 S.E.2d at 692. Thirteen days later, the defendant's brother William Bioletti died and, as a result of his death, the plaintiff was entitled to certain "monies and financial accounts[.]" *Id.* at 270-71, 693 S.E.2d at 692. However, the plaintiff executed a "hand written agreement" transferring away any interest he was entitled to receive to the defendant. *Id.* at 271, 693 S.E.2d at 692. A meeting of creditors was held and subsequently the bankruptcy court entered an order granting the plaintiff's request for bankruptcy discharge. *Id.* The plaintiff then amended his property schedule in the bankruptcy proceeding indicating that he had received $24,747.19 as a result of William Bioletti's death and the

bankruptcy court issued a final decree closing the plaintiff's bankruptcy case. *Id.* The plaintiff subsequently filed a complaint against defendant alleging that the defendant "had unlawfully converted to her own use monies which he was entitled to receive from insurance policies and retirement accounts owned by William Bioletti" and raising claims for fraud and conversion, for the imposition of a constructive trust, and for punitive damages. *Id.* The defendant filed a motion to dismiss and alternatively a motion for summary judgment arguing that the plaintiff's claims were barred by laches and judicial estoppel. *Id.* at 271, 693 S.E.2d at 693. The trial court granted the defendant's motion for summary judgment based on the application of the doctrine of judicial estoppel and the plaintiff appealed. *Id.* at 273, 693 S.E.2d at 694. This Court first determined that the plaintiff's position in the current case was inconsistent with the position that he took in the bankruptcy proceeding as the plaintiff was contending that he was entitled to recover in excess of $92,000 from defendant "which originated from insurance contracts, retirement accounts or similar instruments originally owned by William Bioletti[,]" but had only reported to the bankruptcy Court that he had received $24,747.19, in violation of the bankruptcy code provisions requiring him to disclose all of the monies from William Bioletti's estate. *Id.* at 276-78, 693 S.E.2d at 696-97 (footnote omitted). This Court next determined that the plaintiff had succeeded in persuading the bankruptcy court to accept that the value of his interest in William Bioletti's estate was only $24,797.14 as he never disclosed the full amount of the monies he was entitled to and received a discharge in bankruptcy. *Id.* at 278-79, 693 S.E.2d at 697. This Court, after noting that

> [a]lthough this Court has no bankruptcy jurisdiction and is reluctant, for that reason, to render an opinion concerning the effect that any understatement of Plaintiff's claim to monies resulting from William Bioletti's death may have had on the outcome of his bankruptcy proceeding,

also determined that the "Plaintiff would obtain an unfair advantage in the event that we were to overturn the trial court's decision to the effect that Plaintiff was judicially estopped from proceeding against Defendant in this case" as the defendant had paid all of the plaintiff's creditors in full in the bankruptcy and, if successful in his suit, he would also receive "an amount in excess of $ 92,000 from Defendant[.]" *Id.* at 279, 693 S.E.2d at 697. This Court concluded that the trial court did not abuse its discretion in applying the doctrine of judicial estoppel and affirmed the trial court's summary judgment order in favor of the defendant. *Id.* at 279-80, 693 S.E.2d at 697-98.

Accordingly, we must first consider whether the position that plaintiff Harris has taken in the case before us is inconsistent with the position that he took in the bankruptcy proceeding. It is undisputed that approximately two and a half months after the formation of T-WOL, on 9 January 2001, defendant Harris filed for Chapter 7 bankruptcy protection in the Southern District of New York, listing total liabilities of over $42 million and total assets of $11,398.00. Schedule B of the bankruptcy filings required defendant Harris to list "all personal property of the debtor of whatever kind" including "Stock and interests in incorporated and unincorporated businesses."[4] Plaintiff Harris listed his ownership of 100 shares of "The Winback Organization Ltd" but made no mention of any ownership of T-WOL stock. We note that while plaintiff Harris's bankruptcy was pending, Fair City-Pines Corporation on 20 March 2001 transferred by general warranty deed the disputed property to T-WOL pursuant to the assignment by defendant Edmonds.[5] About two weeks later, in his ongoing bankruptcy proceeding, plaintiff Harris filed his "Statement of Financial Affairs" on 3 April 2001. In this filing, plaintiff Harris was required to list, *inter alia*, "all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case." Plaintiff Harris did not list shares of T-WOL that he allegedly transferred to plaintiff Colbert. The bankruptcy filing also required plaintiff Harris to list any income received "other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case." Again, plaintiff Harris did not list the $10,000 he claimed he had received from plaintiff Colbert in exchange for his 500 shares in T-WOL but only listed $500 in lottery winning in 1999. The bankruptcy filing also required plaintiff Harris to

> list the names and addresses of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation . . . within the two years immediately preced-

---

4. 11 U.S.C. § 521(1) (2009) requires a debtor seeking bankruptcy protection to file a schedule of assets, liabilities, current income, current expenditures, and a statement of the debtor's financial affairs. We also note that property of a bankruptcy estate is defined broadly to include: "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (2009).

5. "The duty of disclosure in a bankruptcy proceeding is a continuing one[.]" *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir. 1999) (citation omitted).

ing the commencement of this case or in which the debtor owned 5 percent or more of the voting or equity securities within the two years immediately preceding the commencement of this case.

Again, plaintiff Harris made no mention of his previous or ongoing involvement in T-WOL. Plaintiff Harris received a discharge from the bankruptcy court in June of 2001.

In contrast to his bankruptcy filings, plaintiffs in their verified complaint alleged that plaintiff Harris was the sole director when T-WOL was incorporated, he was later named as one of the two directors, one of the two shareholders, and was vice president and secretary of T-WOL, and transferred his shares to plaintiff Colbert. Even though plaintiffs argue that plaintiff Harris did not list the transfer of shares to plaintiff Colbert because it was in the "ordinary course of business," the bankruptcy filing still required to disclose the names of any corporation "in which the debtor owned 5 percent or more of the voting or equity securities *within the two years* immediately preceding the commencement of this case." (emphasis added.) Looking to the evidence in the record, we note the corporate records for T-WOL show that on 25 October 2000 the following action was taken: (1) Ben Sirmons, the registering agent, assigned the corporation to defendant Edmonds and plaintiff Harris; (2) by "consent to organizational action[,]" bylaws were adopted, defendant Edmonds was elected as president, plaintiff Harris was elected as vice president and secretary, and 350 shares were issued to defendant Edmonds and 500 shares were issued to plaintiff Harris; and (3) by "consent to action without meeting," plaintiff Harris and defendant Edmonds elected themselves as directors of T-WOL. Also on 25 October 2000, defendant Edmonds, assigned to T-WOL his rights to "amounts loaned to Gilford A. Finch and Fair City-Pines Corporation" and "real property promised in payment thereof by Fair City-Pines Corporation . . . and Gilford A. Finch[.]" Upon examination of all of plaintiff Harris's machinations, it is obvious that he sought to "play 'fast and loose with the judicial system' " *see Whitacre P'ship*, 358 N.C. at 26, 591 S.E.2d at 887, and that he has repeatedly taken inconsistent positions based upon what might be most beneficial to him at the moment. We hold that, just as the plaintiff in *Bioletti*, plaintiff Harris's failure to list in his bankruptcy his involvement and ownership interest in T-WOL was inconsistent with the position that he is taking in this action.

We also hold that plaintiff Harris succeeded in persuading the bankruptcy court to accept that he had no involvement or ownership interest in T-WOL as he never disclosed any involvement in T-WOL to the bankruptcy court and ultimately received a discharge in bankruptcy. Like the Court in *Bioletti*, we will not speculate as to whether the bankruptcy court would have ruled differently in his bankruptcy proceeding if plaintiff Harris had disclosed his involvement in T-WOL, but if we were to rule in his favor, reversing summary judgment, and plaintiffs ultimately succeed in their claims at trial, plaintiff Harris would receive his interest as a shareholder in T-WOL, which would then have value as T-WOL would also own the disputed property, allowing him to derive an unfair advantage from his inconsistent positions. Therefore, we hold that the trial court did not abuse its discretion in its application of the doctrine of judicial estoppel as to plaintiff Harris and plaintiff Harris is estopped from claiming any ownership interest in or position as an officer or director of T-WOL. We also note that our application of the doctrine of judicial estoppel to plaintiff Harris creates an insurmountable obstacle to plaintiffs' remaining claims, as discussed below. *See Gibson*, 121 N.C. App. at 286, 465 S.E.2d at 58.

C. Plaintiff Colbert

[2] Plaintiffs also contend that the trial court "misapplied the doctrine of judicial estoppel by using it to bar not only Harris's claims, but also the claims asserted by T-WOL and Colbert." Defendants argue that the only shareholders of T-WOL were plaintiff Harris and defendant Edmonds; plaintiff Harris is judicially estopped from claiming to be a shareholder or that he transferred shares to plaintiff Colbert; and defendant Edmonds as the sole shareholder of T-WOL could "dissolve the corporation and dispose of its assets[.]" As discussed below, plaintiffs' claims are ultimately based on the existence of and breach of a fiduciary duty by the defendants to each particular plaintiff. To answer the parties' contentions, we must first look at the forecast of evidence to determine plaintiff Colbert's involvement or position in T-WOL, as he is alleged by plaintiffs to be the president, director, and a shareholder in T-WOL, to determine what duty, if any, defendants owed plaintiff Colbert.

1. Status as Shareholder

N.C. Gen. Stat. § 55-1-40(22) (2009) defines a "Shareholder" as

the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent

of the rights granted by a nominee certificate on file with a corporation.

Plaintiffs have presented inconsistent allegations regarding plaintiff Colbert's status as shareholder. First, plaintiffs alleged in their verified complaint that plaintiff Colbert is a shareholder in T-WOL based upon plaintiff Harris's transfer of his 500 shares to plaintiff Colbert in 26 October 2000.[6] But in his deposition, plaintiff Colbert admitted that he was never a stockholder in T-WOL because defendant Edmonds did not sign the share certificates. In his deposition, he repeatedly claimed to have "an interest" in T-WOL because he had provided $10,000.00 to Harris for use in the development of the disputed property but ultimately admitted that this was a personal loan to Harris and he was not a shareholder in T-WOL. However, in their brief on appeal, plaintiffs argue that the shares were properly transferred to plaintiff Colbert because they were endorsed by plaintiff Harris and delivered to plaintiff Colbert. Yet at oral argument before this Court, plaintiffs took the position that even plaintiffs do not actually know whether plaintiff Harris or plaintiff Colbert is a shareholder, but assert that this is irrelevant as summary judgment should be reversed either way, as one of them must be. Defendants counter that plaintiff Colbert was never a shareholder in T-WOL because the shares were never properly transferred to plaintiff Colbert as they were never delivered or endorsed by defendant Edmonds, as president.

Despite their contradictory positions, plaintiffs allege in their verified complaint, and the corporate records of T-WOL show, that on 1 June 2003, plaintiff Colbert transferred the 500 shares of T-WOL stock back to plaintiff Harris. Thus, if the original transfer from plaintiff Harris was valid and plaintiff Colbert was a shareholder, he ceased to be a shareholder when he transferred the 500 shares back to plaintiff Harris. Accordingly, the evidence, even when viewed in the light most favorable to plaintiffs, tends to show that plaintiff Colbert is not and was not at the time of filing of this lawsuit a shareholder of T-WOL. Since we have already determined that plaintiff Harris is estopped from claiming to be a shareholder in T-WOL, and plaintiff Colbert is not a shareholder in T-WOL, defendant Edmonds is the sole shareholder of T-WOL.

---

6. Actually, the complaint alleged that both plaintiffs Harris and Colbert were simultaneously shareholders of T-WOL when the lawsuit was filed, so that there were three shareholders total, a position which appears to be impossible under the facts alleged.

2. Director and Officer

Next, we turn to examine plaintiff Colbert's other positions in T-WOL. Even if he was not a shareholder, plaintiff Colbert claims to have authority to act for plaintiff T-WOL as president. Plaintiff Colbert testified that he was president from 2005 onward and plaintiff Harris testified that defendant Edmonds signed the consent to action forms electing plaintiff Colbert as president. According to T-WOL's corporate records, plaintiff Colbert was elected as a director at the latest on 24 October 2003 by "consent to action without meeting of the shareholders" and elected as president on 25 October 2005. As noted above, defendant Edmonds transferred the contested real property from T-WOL to ECDG South on 24 April 2008. Therefore, according to plaintiffs' arguments, plaintiff Colbert, not defendant Edmonds, was the president and director of T-WOL when the disputed property was transferred out of T-WOL.

Defendant Edmonds states in his affidavit that he has never met plaintiff Colbert, he was never notified of the consent without meeting votes, he never consented to the appointment of plaintiff Colbert as president and director, and those "documents are fraudulent and do not represent my will or consent." Also included in the record is an affidavit from Albert H. Lyter, III, an expert in forensics, in which he states that he examined the consent to action without meeting documents and opined that "they were not prepared in the year indicated on the document" and the signers "signed them all at once" concluding that the documents "were not prepared over the time period indicated on the documents (2000 to 2005) but were prepared simultaneously by each signer." Therefore, there is a genuine issue of fact as to whether plaintiff Colbert was president and a director of T-WOL when defendant Edmonds transferred the property from T-WOL to ECDG South. We must next determine whether this amounts to an issue of "material" fact. *See Mitchell*, ____ N.C. App. at ____, 705 S.E.2d at 764-65.

Plaintiff Colbert's claims for constructive fraud, civil conspiracy, usurpation of corporate opportunity, and unfair and deceptive trade practices are all based on plaintiffs' claims of an alleged breach of fiduciary duty by defendant Edmonds in transferring the disputed property from T-WOL to ECDG South LLC and defendant Clark's participation in this breach of duty. *See Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 249-50, 567 S.E.2d 781, 787-88 (2002) (noting that the claim of constructive fraud requires a

breach of a fiduciary duty and "allegations sufficient to allege con-
structive fraud are likewise sufficient to allege unfair and deceptive
trade practices."), *affirmed per curium* by 357 N.C. 46, 577 S.E.2d
620 (2003); *Meiselman v. Meiselman*, 309 N.C. 279, 307, 307 S.E.2d
551, 567 (1983) (noting that a corporate director or officer can breach
their fiduciary duty by usurpation of a corporate opportunity); *Muse
v. Morrison*, 234 N.C. 195, 198, 66 S.E.2d 783, 785 (1951) (noting that
for the claim of civil conspiracy there must be an underlying wrong-
ful act resulting in injury).[7] Therefore, given plaintiffs' claims, it is
their contention that defendant Edmonds, as the sole shareholder of
T-WOL, owes plaintiff Colbert a fiduciary duty because he is presi-
dent and a director of T-WOL. "A claim for breach of fiduciary duty
requires the existence of a fiduciary duty." *Governor's Club Inc.*, 152
N.C. App. at 247, 567 S.E.2d at 786. A fiduciary relationship "exists in
all cases where there has been a special confidence reposed in one
who in equity and good conscience is bound to act in good faith and
with due regard to the interests of the one reposing confidence."
*Stone v. McClam*, 42 N.C. App. 393, 401, 257 S.E.2d 78, 83, *disc.
review denied*, 298 N.C. 572, 261 S.E.2d 128 (1979) (citation omitted).
"As a general rule, shareholders do not owe a fiduciary duty to each
other or to the corporation." *Freese v. Smith*, 110 N.C. App. 28,
37, 428 S.E.2d 841, 847 (1993) (citing Robinson, *North Carolina
Corporation Law*, § 11.4 (1990))[8]. However, directors and officers of
a corporation owe a fiduciary duty to the corporation and the share-
holders. *See Meiselman v. Meiselman*, 58 N.C. App. 758, 774 295
S.E.2d 249, 259 (1982) (noting that "[d]irectors of a corporation are
trustees of the property of the corporation for the benefit of the
corporate creditors, as well as shareholders."), *modified and aff'd*,
309 N.C. 279, 307 S.E.2d 551 (1983); N.C. Gen. Stat. § 55-8-30 (2009)
(listing the fiduciary duties of a corporate director); N.C. Gen. Stat.
§ 55-8-42 (2009) (listing the fiduciary duties of corporate officers).
However, we find no North Carolina authority addressing the con-

---

7. At the summary judgment hearing, plaintiffs' counsel abandoned their claim
for conversion of the contested real property. *See Norman*, 140 N.C. App. at 414, 537
S.E.2d at 264 (stating that "In North Carolina, only goods and personal property are
properly the subjects of a claim for conversion. A claim for conversion does not apply
to real property." (citation omitted)), *disc. review denied*, 353 N.C. 378, 547 S.E.2d
13 (2001).

8. The exception to this rule is that controlling or majority shareholders owe a
fiduciary duty to minority shareholders in a closely held corporation. *See Freese*, 110
N.C. App. at 37, 428 S.E.2d at 847. This exception is not at issue in this case because
defendant Edmonds is the sole shareholder of T-WOL based on judicial estoppel and
was the minority shareholder even without judicial estoppel.

straints imposed on the actions of an individual regarding a corporate asset who, like defendant Edmonds, is effectively the sole shareholder and a director of the corporation. It appears that the consensus in other jurisdictions is that a sole shareholder of a corporation is generally free to dispose of corporate assets as he sees fit, except where such actions harm or defraud the corporation's creditors, or otherwise violate public policy. *See Anderson v. Benson*, 394 N.W.2d 171, 175 (Minn. Ct. App. 1986); *accord L.R. Schmaus Co. v. Commissioner*, 406 F.2d 1044, 1045 (7th Cir. 1969); *Household Reinsurance Co., Ltd., v. Travelers Ins. Co.*, No. 91 C 1308, 1992 U.S. Dist. LEXIS 1006 (E.D. Ill. January 31, 1992); *See also Pittman v. American Metal Forming Corp.*, 336 Md. 517, 649 A.2d 356, 363-64 (Md. 1994) (holding that a sole shareholder of a corporation does not breach a fiduciary duty to the corporation when he charges lease prices above fair market value for the property and equipment he leased to his corporation). Even though it does not address this exact issue, we find our Supreme Court's reasoning in *Snyder v. Freeman* instructive in explaining the consequences of a sole shareholder's actions on the corporation:

> Under some circumstances, the action of all the shareholders of a close corporation bind the corporation even if the corporation is considered to be a legal entity separate from the shareholders. A corporation is ordinarily bound by acts of its shareholders and directors "only when they act as a body in regular session or under authority conferred at a duly constituted meeting." *Park Terrace, Inc. v. Phoenix Indemnity Co.*, 241 N.C. 473, 478, 85 S.E. 2d 677, 680 (1955), *on rehearing*, 243 N.C. 595, 91 S.E. 2d 584 (1956). Nevertheless, "'[t]he contracts of the sole shareholder, or all the shareholders, will bind the corporation in modern law, although not made by the authority of the board of directors, since they are the only persons beneficially interested, aside from corporate creditors. If they do not distinguish between corporate business and their individual affairs, or waive formalities established for their benefit, there is no reason why the courts should insist on such formalities. The contract of the owners of all shares will be regarded as binding on the corporation if so intended.'" *Philadelphia Life Insurance Co. v. Crosland-Cullen Co.*, 234 F. 2d 780, 783 (4th Cir. 1956), *quoting* Ballentine on Corporations § 126, p. 296.

300 N.C. 204, 210, 266 S.E.2d 593, 597-98 (1980) (footnote omitted). Plaintiffs raise no public policy concerns and there are no alleged corporate creditors. Therefore, even if there is an issue of fact as to whether plaintiff Colbert was a director or president of T-WOL, this is not an issue of material fact because defendant Edmonds as the sole shareholder of T-WOL did not owe a fiduciary duty to the directors or officers of T-WOL and could dispose of the disputed property as he saw fit. Accordingly, plaintiff Colbert's claims of constructive fraud, civil conspiracy, usurpation of corporate opportunity, and unfair and deceptive trade practices, which were based on defendant Edmond's alleged breach of fiduciary duty due to the transfer of the disputed property, were properly dismissed by the trial court.

D.  Plaintiff T-WOL

[3] Since plaintiff Harris has been eliminated by judicial estoppel and plaintiff Colbert has been eliminated because T-WOL has only one shareholder, only claims of plaintiff T-WOL remain. N.C. Gen. Stat. § 55-3-02(1) (2009) states that a corporation has the power "To sue and be sued, complain and defend in its corporate name."[9] However, as defendant Edmonds is the sole shareholder and he did not owe a fiduciary duty to the directors or officers of T-WOL, he also did not owe a fiduciary duty to T-WOL, the corporation, *see Freese*, 110 N.C. App. at 37, 428 S.E.2d at 847, and, as noted above, could dispose of the disputed real property as he saw fit. Accordingly, plaintiff T-WOL's claims of constructive fraud, civil conspiracy, usurpation of corporate opportunity, and unfair and deceptive trade practices, which were based on defendant Edmonds alleged breach of fiduciary duty were properly dismissed by the trial court. Given this determination, we also affirm the trial court's declaration that the transfer of the disputed property from T-WOL to ECDG South, LLC was valid. Additionally, we affirm the transfer of the corporate records to defendant Edmonds as the sole shareholder of T-WOL.

E.  Defendants Clark and ECDG South LLC

[4] Plaintiffs argue that defendant Clark as the accountant for T-WOL breached his fiduciary duty to T-WOL by intentionally failing to file tax returns and annual reports with the Secretary of State which resulted in T-WOL's administrative dissolution; defendants Clark and Edmonds subsequently forming ECDG South LLC; and defendant

---

9. Defendants have not raised any arguments regarding the standing of plaintiffs Harris or Colbert to bring this action on behalf of T-WOL and we express no opinion on this issue.

Edmonds transferring the disputed property from the dissolved T-WOL without any consideration to plaintiffs. Plaintiffs' additional claims for constructive fraud, civil conspiracy, and unfair and deceptive trade practices against defendant Clark are all based on this alleged breach of fiduciary duty. Defendants counter that the forecast of evidence shows that defendant Clark had no duty to T-WOL and the claims against him were properly dismissed.

Plaintiffs' claims against Clark are also based upon the same actions which they claim harmed plaintiff T-WOL, and we have already determined that defendant Edmonds, as sole shareholder, did not owe any duty to either T-WOL or its officers or directors. We are unable to discern how defendant Clark, alleged to be the accountant for T-WOL, could owe any duty to T-WOL above that owed by defendant Edmonds. For the same reasons as discussed above, the trial court properly dismissed plaintiffs' claims of breach of fiduciary duty, civil conspiracy, constructive fraud, and unfair and deceptive trade practice against defendant Clark.

Plaintiffs' claims against ECDG South, LLC were also properly dismissed as its only role in this lawsuit is that it is the company to which the disputed property was transferred, and as discussed above, that transfer was valid. As we have affirmed summary judgment in favor of defendants, we need not address the parties' remaining arguments.

For the foregoing reasons, we affirm the trial court's order.

AFFIRMED.

Judges ELMORE and STEELMAN concur.