An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-120

NORTH CAROLINA COURT OF APPEALS

Filed: 21 October 2014

JOHN A. CASHION,
        Plaintiff,

v.                                           Davidson County
                                             No. 11 CVS 3202

LEXINGTON MEMORIAL HOSPITAL, INC.
AND DAVIDSON HEALTH CARE, INC.,
        Defendants.


Appeal by plaintiff and cross-appeal by defendants from order entered 18 October 2013 by Judge Theodore S. Royster, Jr. in Davidson County Superior Court. Heard in the Court of Appeals 27 August 2014.

> *Wyatt Early Harris Wheeler, LLP, by Kim R. Bauman, for plaintiff-appellant and cross-appellee.*
>
> *Smith Moore Leatherwood LLP, by Patti W. Ramseur, Alexander L. Maultsby, and Elizabeth Brooks Scherer, for defendants-appellees and cross-appellants.*


HUNTER, Robert C., Judge.


Plaintiff appeals from the portion of the trial court's order granting defendants' motion for a directed verdict on plaintiff's breach of contract claim. On appeal, plaintiff argues that the trial court erred in granting defendants' motion for a directed verdict because, reviewing the evidence in the

light most favorable to plaintiff, he presented evidence that he was still an employee in April 2011, the date defendants stopped providing him compensation and benefits. Thus, he argues that defendants breached the Employment Agreement by failing to pay him his salary and benefits until the Employment Agreement expired on 25 September 2011. Defendants contend that plaintiff resigned and that any salary or benefits he received after his resignation were gratuitous; therefore, they did not breach the Employment Agreement because plaintiff was no longer an employee. After careful review, because there is a factual issue as to whether plaintiff resigned or was still an employee at the time defendants stopped providing him any compensation or benefits, we reverse the portion of the trial court's order granting a directed verdict for defendants and remand for trial.

In addition, defendants have cross-appealed from the portion of the trial court's order granting, on its own motion, a directed verdict for plaintiff on defendants' counterclaims of breach of fiduciary duty and constructive fraud. On cross-appeal, defendants contend that the evidence presented was sufficient to submit their counterclaims to the jury. We agree and reverse the trial court's dismissal of defendants' counterclaims because the evidence was at least sufficient to

raise an issue of fact whether plaintiff breached his fiduciary duty and committed constructive fraud.

**Background**

Beginning in 1995, plaintiff John Cashion was president and CEO of defendants Davidson Health Care, Inc. ("DHC") and its affiliate Lexington Memorial Hospital, Inc. ("LMH") (collectively, DHC and LMH are referred to as "defendants" or "the hospitals"). By 2008, defendants were in serious financial trouble, and they began discussing the possibility of a merger with Wake Forest University Baptist Medical Center ("WFUBMC"), Novant, and various other potential partners. By September 2008, it became clear that WFUBMC was the front-runner for the merger.

On 24 September 2008, plaintiff met with Steve Schultz ("Mr. Schultz"), a WFUBMC representative. The details of this meeting were summarized in a letter to plaintiff which was included in the record on appeal. At the meeting, plaintiff was informed that, after the merger, defendants and WFUBMC would be "turn[ing] a new page in [their] leadership team." Specifically, plaintiff would no longer be president and CEO of the newly merged hospital; instead, WFUBMC would "consider new roles" for plaintiff. However, if a new role was not found for

plaintiff, the parties would discuss their "plans to implement the severance agreement provided for [plaintiff] by LMH. In either event, [the parties would] also agree on the most appropriate positioning of [plaintiff's] resignation/retirement/termination from LMH."

The next day, on 25 September, the hospitals' Board of Directors met, without plaintiff, and approved a three-year Employment Agreement (the "Employment Agreement") for plaintiff to remain as president and CEO of the hospitals.[1] Plaintiff and defendants executed the Employment Agreement that same day. Prior to execution of the Employment Agreement, the parties had entered into a one-year initial employment agreement in 1995 (the "1995 employment agreement"), which had been renewed annually.

The Employment Agreement covered a three-year period, commencing 25 September 2008 and ending three years later on 25 September 2011. Under the terms of the Employment Agreement, defendants were entitled to terminate plaintiff with or without cause. Termination without cause required a majority vote of the Board of Directors and 45 days of written notice to plaintiff. In the event plaintiff was terminated without cause,

---

[1] According to defendants, the Board of Directors for both LMH and DHC were made up of the same individuals.

plaintiff was entitled to severance pay and certain benefits for 24 months. Plaintiff was entitled to terminate his employment at any time; to do so, plaintiff was required to provide defendants 90 days of written notice. Should plaintiff invoke this right, defendants would be "released from any and all further obligations" under the Employment Agreement.

The day after plaintiff executed the Employment Agreement with defendants, on 26 September 2008, plaintiff sent a copy of the 24 September 2008 letter from Mr. Schultz to Chuck Taylor ("Mr. Taylor"), the hospitals' Board chairman. The merger with WFUBMC was approved by the hospitals' Board of Directors on 25 September, the same day the Board offered plaintiff the new Employment Agreement, and made public 1 October 2008.

On 2 October 2008, plaintiff sent a memorandum to the Executive Committee of the hospitals' Board of Directors and two representatives of WFUBMC detailing his "Career Plan." In it, plaintiff outlined his "personal preference" and plan to "wind[] down [his] career." He stated that he would like to continue as president/CEO until 1 November 2010 in order to receive the full benefit of his retirement plan. In the alternative, plaintiff offered to remain in the president/CEO position for the full three years covered by his Employment Agreement.

However, he also noted that, "[s]hould [defendants] prefer, however, to transition to a new President/CEO at an earlier junction, I would like to suggest that it be handled as a termination without cause on December 31, 2009 with pay and benefits to continue through the remaining term of the [Employment Agreement]." On 28 October 2008, plaintiff sent out an email and press release noting that he would be "leaving the role of President and CEO." Afterward, plaintiff moved all of his belongings out of the president's office and ceased doing any work.

Discussions continued throughout the beginning of 2009 regarding whether plaintiff would be working in a new capacity for the merged hospital. Emails sent between plaintiff and Mr. Schultz, who had been named the new president and CEO of the merged hospital, indicate that both the economic downturn and organizational delays adversely impacted the discussions about plaintiff's "new role." On 2 January 2009, Mr. Schultz sent plaintiff an email noting that until the discussions concerning plaintiff's new role were complete, "the current Employment Agreement remain[ed] in force." However, the discussions did not result in a new job for plaintiff at the merged hospital.

The record contains numerous correspondence between plaintiff and defendants over the next year and a half. On 17 May 2010, plaintiff sent Mr. Schultz an email noting that, since he is "winding down [his] two years," he proposed a buy-out of his company vehicle. In an email dated 8 July 2010, Mr. Schultz listed several things they needed to discuss including "confirmation of the specific end date of severance payments to be made." Mr. Schultz also requested that plaintiff provide him with the amount of any income he received "during the period of [his] severance" because his severance compensation would need to be offset by this amount pursuant to the terms of the Employment Agreement. Again, on 20 September 2010, Mr. Schultz sent plaintiff a letter describing the "details for closure of the arrangements regarding [his] severance payments and benefits continuation." On 26 January 2011, defendants' accounting office sent an email to plaintiff requesting him to provide them with the "usage" amounts on the company car for tax purposes. Plaintiff responded that he used the car 65% as personal and 35% as business. As one of the final pieces of correspondence between the parties, Mr. Schultz sent plaintiff a letter on 14 February 2011 outlining the outstanding financial and administrative matters that needed to be resolved "[a]s [they]

move to conclude and finalize all arrangements between [plaintiff] and [the merged hospital] pursuant to the terms of [the] Employment Agreement[.]"

On 10 December 2010, plaintiff's attorney sent a letter to WFUBMC claiming for the first time that plaintiff was "not in 'severance' status" but, instead, remained "employed." Accordingly, plaintiff's counsel claimed that he was entitled to continued employee benefits through 25 September 2011, when the Employment Agreement would expire. Ultimately, all compensation from defendants to plaintiff ended 6 April 2011. In sum, over the 29 months after plaintiff announced that he was leaving his position, plaintiff received payments of over $560,000 and several benefits that he otherwise would not have been entitled to if he was in severance.

After defendants refused to provide any further compensation or benefits, on 29 September 2011, plaintiff filed suit against them alleging breach of the Employment Agreement. Defendants filed counterclaims for breach of fiduciary duty and constructive fraud. The matter came on for trial on 3 September 2013. After four days of plaintiff's evidence, defendants moved for a directed verdict. The trial court denied their motion and also, *sua sponte*, granted a directed verdict for plaintiff on

defendants' counterclaims and dismissed them. Defendants did not present any evidence at trial and, after additional evidence, renewed their motion for a directed verdict. Having heard all the evidence and additional arguments, the trial court granted defendants' motion and dismissed plaintiff's breach of contract claim. Both plaintiff and defendants timely appealed.

**Standard of Review**

Our review of a trial court's order granting a motion for a directed verdict is well-established:

> The standard of review of [a] directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury. In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor.

*Rink & Robinson, PLLC v. Catawba Valley Enterprises, LLC*, __ N.C. App. __, __, 725 S.E.2d 426, 429 (internal citations and quotation marks omitted), *disc. review denied*, 366 N.C. 241, 731 S.E.2d 414 (2012).

**Plaintiff's Arguments**

The gist of plaintiff's arguments is that because there is an issue of fact as to whether plaintiff was still an employee at the time defendants stopped paying him any compensation or benefits, the trial court should not have entered a directed verdict for defendants. Specifically, plaintiff contends that defendants "treated and paid [him] as an employee, not as an ex-employee under severance." Furthermore, he argues that defendants breached the Employment Agreement when they stopped providing him the compensation and benefits he was entitled to before the Employment Agreement expired on 25 September 2011. We agree with plaintiff that the evidence creates an issue of fact as to plaintiff's employment status at the time defendants stopped paying him any compensation or benefits. Therefore, the issue should have been submitted to the jury.

The Employment Agreement covered a period of three years and would expire on 25 September 2011. The Employment Agreement contemplated three different scenarios for the termination of plaintiff's employment: (1) plaintiff could be terminated with cause by the Board of Directors; (2) plaintiff could be terminated without cause by the Board of Directors which would entitle him to 24 months of severance; and (3) plaintiff could terminate his own employment which would end all of defendants'

obligations to him under the Employment Agreement. However, contrary to some of the arguments advanced in their brief, defendants conceded at oral argument that their only argument on appeal is that plaintiff resigned on 28 October 2008 and claimed that any benefits or compensation provided to plaintiff after this point were gratuitous. In other words, defendants specifically admitted that plaintiff was not in severance status and, consequently, abandoned this argument on appeal. Furthermore, while plaintiff admitted that he stepped down from his position as CEO and president, he specifically denied that he ended his employment relationship with defendants under the Employment Agreement. Thus, the only issue on appeal is whether the evidence, when reviewing it in a light most favorable to plaintiff, was sufficient to show that plaintiff was still an employee at the time defendants stopped providing him any compensation or benefits.

Here, our review of the record leads us to conclude that there was sufficient evidence for the jury to find that plaintiff was still an employee on 6 April 2011. Although the Employment Agreement related only to plaintiff's employment as president and CEO of the hospitals, it also noted that plaintiff may be required to perform "other duties as may from time to

time be assigned by the Boards of Directors." Thus, these "other duties" may include things that were not ancillary to being in the role of CEO or president. In his 2 October 2008 memorandum to the hospitals' Board of Directors, plaintiff indicated his willingness to remain the president/CEO of the newly merged hospital until the Employment Agreement expired. Moreover, even after plaintiff had officially left his position on 28 October, correspondence from defendants indicated that the Employment Agreement was still valid and in force. Mr. Schultz sent plaintiff an email specifically stating that plaintiff's Employment Agreement remained "in force" on 2 January 2009. In fact, defendants' correspondence suggested that the Employment Agreement was still in effect until 14 February 2011 when Mr. Schultz indicated his desire to wrap up some lingering matters with plaintiff "pursuant to the terms of [the] Employment Agreement." If plaintiff had resigned, as defendants contend, then the Employment Agreement would no longer apply. In other words, there is a conflict between what defendants said in their correspondence and their argument on appeal that defendant had resigned in October 2008.

Furthermore, it is important to note that defendants continued to pay plaintiff as if he were still an employee. Not

only did he receive his base compensation, but he also received certain benefits, including an automobile, cell phone, and secretarial assistance, that he would not be entitled to if he resigned or was in severance status. Defendants even inquired as to plaintiff's business "usage" of the automobile for tax purposes and raised no objection when plaintiff claimed he used it 35% of the time for business purposes. Finally, there is no evidence in the record that plaintiff provided 90 days written notice that he was terminating his employment. Although plaintiff's press release indicated that he was "stepping down" from his position, he also noted that he would be employed in another capacity with the newly merged hospital.

In sum, there is a conflict in the evidence as to plaintiff's employment status that should have been resolved by the jury. Construing the evidence in plaintiff's favor, there was sufficient evidence that he remained an employee; thus, the trial court erred in granting a directed verdict in defendants' favor. Accordingly, we reverse the portion of the trial court's order granting a directed verdict for defendants on plaintiff's breach of contract claim and remand for trial.

**Defendants' Cross-Appeal**

In their cross-appeal, defendants contend that the trial court committed reversible error by granting a directed verdict on their counterclaims before they had a chance to present evidence and that there was sufficient evidence on their claims for breach of fiduciary duty and constructive fraud to submit the issue to the jury. Defendants' breach of fiduciary duty and constructive fraud claims are based on their allegations that plaintiff, as president and CEO, failed to disclose to defendants that, at the time he signed the Employment Agreement and secured himself much better benefits should he be terminated without cause, he already knew that his position would be terminated once the merger occurred.

"A claim for breach of fiduciary duty requires the existence of a fiduciary duty," *T-WOL Acquisition Co., Inc. v. ECDG S., LLC*, __ N.C. App. __, __, 725 S.E.2d 605, 617 (2012), and that "the fiduciary failed to act in good faith and with due regard to [the other party's] interests," *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005).

Even assuming, without deciding, that the trial court was not procedurally prohibited from granting a directed verdict for plaintiff on defendants' counterclaims before defendants

presented any evidence, we conclude that it was improper in light of the evidence at the time it was entered. Here, it is undisputed that plaintiff owed defendants a fiduciary duty as the president and CEO. Defendants contend that plaintiff breached that duty by wrongfully failing to disclose to them that he already knew that he would be replaced once the merger occurred. Construing the evidence in defendants' favor, the evidence was sufficient to submit the issue to the jury. Defendants had no knowledge about plaintiff's meeting with WFUBMC's representatives on 25 September 2011, the day before defendants approved the Employment Agreement for plaintiff. Specifically, defendants were unaware of the fact that plaintiff had been informed that he would not remain in his current position as president and CEO once the merger occurred. Even knowing this, plaintiff secured himself a better deal should he be terminated without cause because the Employment Agreement would give him 24 months of severance as opposed to only 12 in the 1995 employment agreement. Thus, defendants pled sufficient facts to at least raise an issue of fact as to whether plaintiff breached his fiduciary duty.

Similarly, the evidence was sufficient to submit defendants' constructive fraud claim to the jury. This Court has noted:

> A constructive fraud complaint must allege facts and circumstances (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff. Further, an essential element of constructive fraud is that defendants sought to benefit themselves in the transaction.

*State ex rel. Long v. Petree Stockton, L.L.P.*, 129 N.C. App. 432, 445, 499 S.E.2d 790, 798 (1998) (internal citations and quotation marks omitted). As discussed, construing the evidence in a light most favorable to defendants, the evidence was sufficient to support their contention that plaintiff took advantage of his position and wrongfully failed to disclose that his position would be terminated once the merger occurred. Furthermore, this omission led to a better deal for plaintiff once the merger occurred because he would receive double the amount of severance under the terms of the Employment Agreement. Accordingly, the evidence was sufficient to raise an issue of fact whether plaintiff committed constructive fraud, and the issue should have been resolved by the jury.

In summary, defendants pled sufficient facts in support of their counterclaims that required their submission to the jury. Consequently, we reverse the portion of the trial court's order granting, on its own motion, a directed verdict for plaintiff on defendants' counterclaims.

## Conclusion

In sum, because the evidence was sufficient to at least raise an issue of fact as to whether plaintiff was an employee at the time defendants stopped paying him compensation and benefits, the trial court erred in granting defendants' motion for a directed verdict. Therefore, we reverse the trial court's order entering a directed verdict for defendants on plaintiff's breach of contract claim. In addition, construing the evidence in a light most favorable to defendants, there was sufficient evidence to support defendants' counterclaims for breach of fiduciary duty and constructive fraud, and they were also an issue for the jury. Accordingly, we also reverse the trial court's order dismissing defendants' counterclaims.

REVERSED AND REMANDED.

Judges DILLON and DAVIS concur.

Report per Rule 30(e).