Indus. Fabricators, Inc. v. At-Net Servs. - Charlotte, Inc., 2018 NCBC 45.

STATE OF NORTH CAROLINA

GASTON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 84

INDUSTRIAL FABRICATORS, INC.,

Plaintiff,

v.

AT-NET SERVICES - CHARLOTTE,
INC.; JEFFREY S. KING; and
DANIEL S. DUNKIN,

Defendants.

**ORDER AND OPINION ON
PLAINTIFF'S MOTION TO DISMISS
COUNTERCLAIMS AND FOR
PARTIAL SUMMARY JUDGMENT**

1.     Defendant At-Net Services - Charlotte, Inc. ("At-Net") provided information technology support services for Plaintiff Industrial Fabricators, Inc. ("IFab") for over a decade.  When IFab became dissatisfied with At-Net's work, it terminated their relationship and brought this lawsuit.  At-Net responded with twelve counterclaims asserting that IFab failed to pay for nearly $500,000 in services rendered.

2.     IFab now contends that At-Net lacks standing to bring four of its counterclaims or, alternatively, should be judicially estopped from asserting them. The gist of both arguments is that At-Net improperly concealed the unpaid services during its Chapter 11 bankruptcy in 2015 and 2016.  Having considered all relevant matters of record, the Court **DENIES** IFab's motion.

> *Alexander Ricks PLLC, by Rodney E. Alexander and Mary K. Mandeville, for Plaintiff.*

> *Erwin, Bishop, Capitano & Moss, P.A., by A. Todd Capitano and Matthew Holtgrewe, for Defendants.*

Conrad, Judge.

# I.
## PROCEDURAL HISTORY

3. On January 10, 2017, IFab filed its complaint, which it amended later that month. (Compl., ECF No. 1; Am. Compl., ECF No. 2.) The amended complaint asserts three claims against At-Net, and seven claims against At-Net and two of its officers, Jeffrey King and Daniel Dunkin.

4. Defendants timely answered on April 3, 2017. (ECF No. 16.) At-Net also asserted six counterclaims for breach of contract and unjust enrichment.

5. At the request of the parties, the Court temporarily stayed all deadlines pending an early mediation. (ECF Nos. 17, 18.) The mediation was unsuccessful, and At-Net amended its counterclaims on June 15, 2017 to include six additional claims for breach of contract and unjust enrichment. (First Am. Countercl., ECF No. 19 ["Countercl."].)

6. IFab answered the counterclaims and denied any wrongdoing. (IFab's Answer to First Am. Countercl., ECF No. 24 ["IFab's Answer"].) Three days later, IFab filed its motion to dismiss or, in the alternative, for summary judgment as to four of At-Net's counterclaims under Rules 12(b)(1) and 56 of the North Carolina Rules of Civil Procedure. (ECF No. 26.) The motion has been fully briefed. IFab also objected to two affidavits filed by At-Net, which then moved for leave to supplement the record with amended affidavits to overcome the objections. (ECF Nos. 44, 47.) The Court held a hearing on December 5, 2017, at which the parties were represented by counsel.

## II.
## BACKGROUND

7. This action includes an array of claims and counterclaims arising out of the lengthy, though now ruptured, relationship between IFab and At-Net. The following factual summary focuses on At-Net's counterclaims and its Chapter 11 bankruptcy, which are the subject of IFab's motion. By reciting the relevant allegations in the pleadings and drawing from the evidence offered by both parties, the Court does not make findings of fact.

### A. IFab and At-Net's Relationship

8. At-Net provides information technology ("IT") services. (Am. Aff. Berman ¶ 3, ECF No. 47.1.) IFab, a metal parts fabricator, was one of At-Net's clients from roughly 2005 until 2016. (*See* Aff. Bingham ¶ 4, ECF No. 28.) IFab describes it as a one-sided relationship in which At-Net gained nearly complete control over IFab's network and systems. (*See* Am. Compl. ¶¶ 25, 27.) At-Net sees things differently, alleging that IFab retained control over its systems but failed to devote appropriate resources and training to its own staff. (*See* Countercl. ¶ 5; Am. Aff. Berman ¶¶ 24, 26–27.)

9. There appears to be no dispute, though, that the relationship changed in significant ways in 2014 when IFab's in-house IT employee, Jody Outlaw, unexpectedly passed away. (Am. Compl. ¶ 24; Countercl. ¶ 2.) IFab describes Outlaw as its "most experienced IT support person." (IFab's Answer ¶ 2.) With his sudden passing, IFab turned to At-Net for additional support in maintaining its Electronic

Data Interchange ("EDI"), a platform IFab uses to communicate with its customers. (Am. Aff. Berman ¶¶ 24–25; Countercl. ¶¶ 2–4.)

10. At-Net alleges that it agreed to bill IFab "on a time and materials basis" for EDI support but that, over time, the increased demand for its services affected its billing cycle. (Countercl. ¶ 3.) Initially, At-Net billed IFab's simpler requests at a flat rate and billed more complex matters separately. (Am. Aff. Berman ¶¶ 21–22.) By May 2016, with no replacement having been hired for Outlaw, At-Net agreed to bill IFab a flat fee of $2,000 per week for EDI support services, allowing any excess to accrue for payment at a future date. (Am. Aff. Berman ¶ 38; Countercl. ¶¶ 5–6.) Within a few months, significant excess fees accumulated. At-Net concluded that IFab would never be able to catch up through the weekly payment arrangement and insisted on full payment as services were incurred. (Am. Aff. Berman ¶ 38.) At-Net points to evidence that the number of service requests spiked by 875% between 2014 and 2016, shifting from periodic to almost daily support. (Am. Aff. Berman ¶ 24; *see also* Countercl. ¶ 4.)

11. In 2016, IFab faced a string of IT troubles, all of which it blames on At-Net. IFab became increasingly unhappy with At-Net's maintenance of the EDI. (*See* Aff. Bingham ¶¶ 6–7.) IFab asserts that the EDI became unreliable, leading to customer complaints, and that At-Net was unable to correct the problems. (*See* Aff. Bingham ¶¶ 6–7.) In September 2016, IFab's network was crippled by a ransomware attack, which IFab attributed to At-Net's negligence in maintaining appropriate security. (*See* Aff. Bingham ¶ 8.)

12. By the end of 2016, the relationship was past the breaking point, and IFab terminated its contract with At-Net. (*See* Aff. Bingham ¶ 9.) At-Net immediately delivered nine invoices to IFab "totaling about $460,000 for services rendered as far back as June 4, 2015." (Aff. Bingham ¶ 9; *see also* Countercl. ¶¶ 13–14.) IFab refused to pay and instead filed this suit, prompting At-Net to assert four counterclaims as to the unpaid invoices for EDI support along with eight additional counterclaims. (*See* Countercl. ¶¶ 15–37.)

## B. At-Net's Bankruptcy

13. At the same time that its relationship with IFab was deteriorating, At-Net was undergoing Chapter 11 reorganization. At-Net filed its bankruptcy petition in December 2014, its initial disclosure statement in January 2015, and its joint disclosure statement and joint plan of reorganization in April 2015. (Aff. Alexander ¶ 3, ECF No. 29; Am. Aff. Berman ¶ 33.) It is undisputed that At-Net remained a debtor-in-possession and took on the duties and responsibilities of the bankruptcy trustee. (*See* Aff. Alexander ¶ 3.)

14. In the initial reorganization plan, At-Net committed all of its net income for 2015 through 2017 to its bankruptcy creditors. (Aff. Alexander Ex. 1.6.) At-Net also predicted it would have only $69,609 and $45,882 available for its unsecured creditors in 2015 and 2016, respectively, based on historical revenue figures. (Aff. Alexander Ex. 1.12 at Ex. D; Am. Aff. Berman ¶ 40.) The plan was amended several times. In June 2015, At-Net offered to set aside 99.7 percent of its net income from 2016 through 2018 for unsecured creditors. (Aff. Alexander Ex. 1.11 at pp.9–10.)

Ultimately, the plan drew objections from two of At-Net's largest creditors, both of which reached settlements and agreed to accept fixed amounts, rather than percentages, of future income. (*See* Aff. Alexander Exs. 1.20–21, 1.23 at p.3.) In the final plan, At-Net committed an additional 23.4 percent of its net income from 2016 through 2018 to its remaining creditors. (*See* Aff. Alexander Ex. 1.23.)

15. The bankruptcy court confirmed the plan with an effective date of January 1, 2016. (Aff. Alexander Ex. 1.23.) At-Net's case was closed as "fully administered" on October 5, 2016. (Aff. Alexander Ex. 1.26.)

16. At no point in the bankruptcy proceeding did At-Net disclose any deferred billings for EDI support. IFab asserts that these billings, incurred during the bankruptcy proceeding, are property of the bankruptcy estate under 11 U.S.C. § 541(a). It also asserts that At-Net, as debtor-in-possession, was required to disclose its unpaid work for IFab to the bankruptcy court.

III.
MOTION TO DISMISS

17. IFab moves to dismiss four of At-Net's counterclaims under Rule 12(b)(1) and, in the alternative, for entry of summary judgment under Rule 56. Because IFab's motion to dismiss challenges this Court's subject matter jurisdiction, the Court addresses it first.

A. Legal Standard

18. "Standing generally refers to a party's right to have a court decide the merits of a dispute." *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 NCBC LEXIS 33, at *19 (N.C. Super. Ct. Apr. 11, 2017). It "is a necessary prerequisite to a court's

proper exercise of subject matter jurisdiction." *Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002) (citing *Creek Pointe Homeowner's Ass'n v. Happ*, 146 N.C. App. 159, 165, 552 S.E.2d 220, 225 (2001)).

19. In deciding whether subject matter jurisdiction exists, the Court may consider matters outside the pleadings. *See Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978). The absence of subject matter jurisdiction requires dismissal. *See* N.C. R. Civ. P. 12(h)(3); *Harris v. Pembaur*, 84 N.C. App. 666, 667, 353 S.E.2d 673, 675 (1987).

B. <u>Analysis</u>

20. IFab contends that any amounts it may have owed At-Net for EDI support performed during the bankruptcy became property of the bankruptcy estate and continue to be estate property. (*See* Pl.'s Br. Supp. Mot. to Dismiss & for Partial Summ. J. 12, ECF No. 27 ["Br. Supp."]; Pl.'s Reply Supp. Mot. to Dismiss & for Partial Summ. J. 5–6, ECF No. 42 ["Reply"].) If IFab is correct, At-Net lacks standing to assert its EDI-related counterclaims, and the Court lacks subject matter jurisdiction. *See Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 26, 560 S.E.2d 817, 822 (2002) ("North Carolina state trial courts lack subject matter jurisdiction to hear claims that belong to a bankruptcy estate.").

21. For the reasons discussed below, the Court concludes that At-Net has standing. Although part of the deferred billings for EDI support became property of the estate, the Bankruptcy Code expressly vests all property of the estate in the debtor upon confirmation of the reorganization plan. *See* 11 U.S.C. § 1141(b). As a

result, any deferred billings vested in At-Net at the time of plan confirmation, and it has standing to assert its counterclaims seeking to recover these amounts.

1. At-Net's Bankruptcy Estate

22.    By statute, the commencement of a Chapter 11 reorganization "creates an estate." 11 U.S.C. § 541(a). "An estate is a separate legal identity, created on (and by) the filing of a bankruptcy petition, and continuing until confirmation, conversion, or dismissal of the case." *In re Herberman*, 122 B.R. 273, 278 (Bankr. W.D. Tex. 1990). Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). It also includes "[a]ny interest in property that the estate acquires after the commencement of the case." *Id.* § 541(a)(7).

23.    In its opposition brief, At-Net argued that its counterclaims do not concern estate property because "[a]ll of the work for which [it] seeks recovery . . . was performed post-petition." (Defs.' Br. Resp. to Pl.'s Mot. to Dismiss & for Partial Summ. J. 9, ECF No. 36 ["Br. Resp."].) At-Net pointed to the generally accepted principle that "property acquired by the debtor after the petition is filed may be retained by the debtor, clear of all claims ultimately discharged by the bankruptcy proceeding." (Br. Resp. 8 (quoting *United States v. Gold (In re Avis)*, 178 F.3d 718, 720 (4th Cir. 1999).)

24.    At the hearing, At-Net's counsel retreated from this position and allowed that some of the amounts receivable for work performed during the bankruptcy

should be considered property of the estate, not property of the debtor. The concession was a good one.

26. Typically, the debtor in a Chapter 11 bankruptcy remains a debtor-in-possession, just as At-Net did here. *See* 11 U.S.C. § 1101(1); *see also United Surety & Indem. Co. v. López-Muñoz (In re López-Muñoz)*, 866 F.3d 487, 497 (1st Cir. 2017); *Chicago Truck Drivers v. El Paso CGP Co.*, 525 F.3d 591, 598 (7th Cir. 2008). That means the debtor itself serves as the trustee of the estate, keeping possession of any assets and "administer[ing] them for the benefit of the creditor body." *Bowers v. Atlanta Motor Speedway (In re Se. Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 152 n.1 (4th Cir. 1996). The debtor-in-possession holds all the powers and responsibilities of the trustee, including the ability to continue operating the business. *See* 11 U.S.C. §§ 1107, 1108.

26. In that circumstance, the receivables generated by the ongoing enterprise are generated *by the estate*. They are not property of the debtor but instead "logically fit into § 541(a)(7) as property acquired by the estate during the pendency of the bankruptcy." *In re Evans*, 337 B.R. 551, 557 (Bankr. E.D.N.C. 2005) (citation and quotation marks omitted); *see also Lowe v. Yochem (In re Reed)*, 184 B.R. 733, 739 (Bankr. W.D. Tex. 1995); *In re Herberman*, 122 B.R. at 279.

27. At least some of the EDI support that At-Net performed fits into this category. The disputed invoices include more than $100,000 in services performed after the petition was filed but before plan confirmation. (*See* Aff. Bingham ¶ 9, Ex. 1; *see also* Br. Supp. 5; Br. Resp. 9.) These receivables were therefore "generated by

the estate enterprise." *In re Evans*, 337 B.R. at 557 (citation and quotation marks omitted). And At-Net's right to payment for this work, which At-Net now seeks to recover in its counterclaims, became property of the bankruptcy estate. *See id.*; *In re Herberman*, 122 B.R. at 279.

28. The remaining invoices itemize more than $300,000 in additional services performed *after* plan confirmation. (*See* Aff. Bingham ¶ 9, Ex. 1; Aff. Alexander ¶ 15.) These amounts were not generated by the estate because "the estate ceased to exist" upon plan confirmation. *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008). Section 541(a)(7) therefore does not apply, and these receivables were never property of the estate.

2. Section 1141(b)

29. The fact that some receivables for EDI support were property of the estate during the bankruptcy proceeding does not necessarily mean that At-Net lacks standing to pursue its claims now that the bankruptcy is complete. At-Net contends that all estate property vested in it by operation of law upon plan confirmation, thus restoring its right to sue. (*See* Br. Resp. 9–10.) IFab responds that At-Net's right to payment for post-petition work remains property of the estate because At-Net never disclosed it to the bankruptcy court. (*See* Reply 6–7.)

30. In a Chapter 11 reorganization, "the confirmation of a plan vests *all of the property of the estate* in the debtor" unless the plan itself or the bankruptcy court's confirmation order provides otherwise. 11 U.S.C. § 1141(b) (emphasis added). Neither side suggests that At-Net's reorganization plan or the confirmation order

authorizes any exceptions here. A plain reading of the statute therefore supports At-Net's argument that all estate property, including the property at issue in the counterclaims, vested in At-Net as of January 1, 2016, the effective date of confirmation. (*See* Aff. Alexander Ex. 1.23.)

31. Most federal courts appear to agree that the statute means just what it says. A reorganization plan may exempt property from the vesting procedure in section 1141(b). *See Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1460 (5th Cir. 1987). But in the absence of "contrary provisions" in the plan, confirmation serves to vest estate property in the debtor "along with normal ownership rights." *In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 462 (6th Cir. 1991) (internal quotation marks omitted); *see also Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 837–38 (4th Cir. 2007); *Linsenmeyer v. United States (In re Linsenmeyer)*, 92 Fed. App'x 101, 102–03 (6th Cir. 2003). The "revested" property is no longer property of the estate and is beyond the bankruptcy court's jurisdiction. *See Bell v. Bell (In re Bell)*, 225 F.3d 203, 216 (2d Cir. 2000).

32. IFab insists that "undisclosed assets remain estate property." (Reply 6.) Its position is driven largely by policy considerations, rather than the statutory text. The law, IFab contends, should not permit a debtor to conceal assets from the bankruptcy court and creditors only then to use the assets later for its own benefit. (*See* Reply 7.)

33. The argument has surface appeal. A debtor-in-possession holds not only the rights but also the duties of a trustee, including the "fiduciary" obligation to act "in

the interests of the creditors." *In re J.T.R. Corp.*, 958 F.2d 602, 604–05 (4th Cir. 1992). Disclosure is one of the most fundamental duties of the debtor-in-possession. *See In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009); *Petit v. New England Mortg. Servs. Inc.*, 182 B.R. 64, 69–70 (D. Me. 1995). "Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process and begins on day one, with the filing of the Chapter 11 petition." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). When a debtor tells the bankruptcy court one thing and later says another after discharge, the integrity of the process is called into question. Courts can and should use available equitable tools—for example, judicial estoppel—to prevent abuse and preserve the integrity of the judicial process. *See, e.g., Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 420 (Bankr. 9th Cir. 2007).

34. But standing is the wrong inquiry. The text of section 1141(b) is clear, and importing an equitable exception "would defy congressional intent." *Lawski v. Frontier Ins. Grp. LLC (In re Frontier Ins. Grp., Inc.)*, 2018 Bankr. LEXIS 442, at *35 (Bankr. S.D.N.Y. Feb. 15, 2018); *see also Greenheart Durawoods, Inc. v. PHF Int'l Corp.*, 1994 U.S. Dist. LEXIS 16509, at *7 (S.D.N.Y. Nov. 18, 1994). "When property of the estate has been vested in the debtor, it cannot be said that the chapter 11 debtor has no standing after the case is closed." *Diamond Z Trailer,* 371 B.R. at 419; *see also Idearc Media LLC v. Glassman*, 2011 U.S. Dist. LEXIS 14865, at *4–5 (E.D. Pa. Feb. 15, 2011).

35.    *Idearc Media* dealt with this issue persuasively.   The plaintiff failed to disclose a post-petition claim for breach of contract during its Chapter 11 bankruptcy. *See Idearc Media*, 2011 U.S. Dist. LEXIS 14865, at \*2.  When the plaintiff later brought this claim, the defendant argued that it lacked standing because "the cause of action remain[ed] property of the bankruptcy estate."  *Id*.   The district court disagreed.  Because section 1141(b) plainly applies to all property of the estate, "even if a Chapter 11 debtor fails to schedule a cause of action during bankruptcy proceedings, that cause of action vests in the debtor and the debtor has standing to sue" following plan confirmation. *Id.* at \*4–5.  The court noted, though, that the claim could be subject to a defense of judicial estoppel at a later stage in the case.  *See id.* at \*10.

36.    The cases cited by IFab do not require a different result.  Some relate to Chapter 7, a context in which "courts have held that where a debtor conceals an asset or fails to schedule it, the asset remains the property of the bankruptcy estate and, accordingly, the debtor can be found to lack standing to pursue its further disposition." *In re Kane*, 628 F.3d 631, 641 (3d Cir. 2010).  These cases offer no useful guidance because Chapter 7 has no analog to section 1141(b).

37.    IFab also relies on two cases in which courts dismissed claims of a former Chapter 11 debtor for lack of standing.  *See Coney Island Land Co., LLC v. Domino's Pizza LLC*, 2017 U.S. Dist. LEXIS 6941, at \*11–14 (E.D.N.Y. Jan. 18, 2017); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 52–55 (S.D.N.Y. 1999).  In *Coney Island*, the court did not cite or address section 1141(b) and instead held that the debtor lacked

standing based on precedents relating to Chapter 7. 2017 U.S. Dist. LEXIS 6941, at *13 (citing *Myers v. Costco Wholesale Corp.*, 2007 U.S. Dist. LEXIS 71566, at *4 (E.D.N.Y. Sept. 26, 2007)).

38.     *Kunica*, on the other hand, addressed a different question altogether. The court based its decision on section 349(b) of the Bankruptcy Code, which concerns vesting of property after dismissal, not confirmation. *See Kunica*, 233 B.R. at 53. The case is therefore inapposite.

39.     It bears noting that *Kunica* touched briefly on section 1141(b) in dictum, stating that "[t]he debtor may recover property of the estate . . . upon confirmation of a plan of reorganization" but "only property that was 'dealt with by the plan is free and clear of all claims and interests of creditors . . . .'" *Id*. at 52–53 (quoting 11 U.S.C. § 1141(c)). The court stated that "undisclosed claims are not 'dealt with' by the plan" and "do not revert to the debtor free of the claims of creditors." *Id*. at 53. To the extent IFab interprets *Kunica* to mean that only claims "dealt with" by the plan vest under section 1141(b), the Court disagrees. *Kunica* appears to envision that undisclosed claims vest in the debtor but may remain subject to creditors' claims. Moreover, section 1141(b)'s predecessor included language stating that "only 'property dealt with' in a plan or arrangement revested." *Diamond Z Trailer*, 371 B.R. at 419; *see also* Bankruptcy Act § 70(i), 11 U.S.C. § 110(i) (1976). The fact that Congress omitted this language from section 1141(b) strongly suggests that "all the property" means *all*—disclosed or undisclosed, scheduled or unscheduled, dealt with

by the plan or not. *See Idearc Media*, 2011 U.S. Dist. LEXIS 14865, at \*4–5; *Greenheart Durawoods*, 1994 U.S. Dist. LEXIS 16509, at \*6–7.

40.     Accordingly, At-Net, as a former Chapter 11 debtor, has standing to assert its counterclaims because all property of the estate vested in At-Net when the bankruptcy court confirmed its plan of reorganization. *See Idearc Media*, 2011 U.S. Dist. LEXIS 14685, at \*4–5. The Court therefore denies IFab's motion to dismiss. *See Newton v. Barth*, 788 S.E.2d 653, 661 (N.C. Ct. App. 2016) (reversing grant of motion to dismiss for lack of standing because claim belonged to plaintiffs, not bankruptcy estate); *Keener Lumber*, 149 N.C. App. at 26–27, 560 S.E.2d at 822–23 (affirming denial of motion to dismiss for lack of subject matter jurisdiction).

## IV.
## MOTION FOR SUMMARY JUDGMENT

41.     Although section 1141(b) unequivocally vests all property in the debtor upon plan confirmation, it is not a license to conceal assets from the bankruptcy court. Courts routinely apply equitable doctrines, including judicial estoppel, "to preserve the integrity of the system" and to prevent unwarranted windfalls to debtors. *Diamond Z Trailer*, 371 B.R. at 420; *see also T-WOL Acquisition Co. v. ECDG South, LLC*, 220 N.C. App. 189, 199–205, 725 S.E.2d 605, 612–15 (2012); *Bioletti v. Bioletti*, 204 N.C. App. 270, 276–80, 693 S.E.2d 691, 695–98 (2010).

42.     Judicial estoppel is the subject of IFab's motion for summary judgment. IFab contends that At-Net's allegation that it deferred nearly half a million dollars in EDI support billings in 2015 and 2016 is inconsistent with its failure to disclose the deferred billings during the bankruptcy proceeding. (*See* Br. Supp. 17–18.) At-

Net concedes that it did not disclose the deferred billings for EDI support but contends that it was not required to do so. (*See* Br. Resp. 13–20.)

43. After careful consideration of the record, the Court concludes that summary judgment is not appropriate. Taking the facts in a light most favorable to At-Net, the Court cannot conclude as a matter of law that At-Net intentionally concealed material information from the bankruptcy court.[*]

A. Legal Standard

44. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-mov[ant]," taking the non-movant's evidence as true and drawing inferences in its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001) (citation and quotation marks omitted).

45. The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). If the moving party carries this burden, the responding party "may not rest upon the mere allegations or denials of his pleading," N.C. R. Civ. P. 56(e), but must instead "come forward with specific facts establishing

---

[*] IFab objected to the affidavits submitted by At-Net in opposition. In response, At-Net moved to supplement the record to include amended affidavits designed to overcome the objections. After full consideration, the Court grants At-Net's motion to supplement and overrules IFab's objections.

the presence of a genuine factual dispute for trial," *Liberty Mut. Ins.*, 356 N.C. at 579, 573 S.E.2d at 124. A "genuine issue" exists when "'it is supported by substantial evidence,' which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Id.* (citation omitted) (quoting *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002)).

B. <u>Analysis</u>

46. Generally speaking, "judicial estoppel forbids a party from asserting a legal position inconsistent with one taken earlier in the same or related litigation." *Price v. Price*, 169 N.C. App. 187, 191, 609 S.E.2d 450, 452 (2005) (internal quotation marks omitted). The doctrine defies rigid definition, but our Supreme Court has identified three key factors: (1) whether a party's subsequent position is clearly inconsistent with its earlier position; (2) whether the party "succeeded in persuading a court to accept that party's earlier position"; and (3) whether the party asserting the "inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Whitacre P'ship v. BioSignia, Inc.*, 358 N.C. 1, 29, 591 S.E.2d 870, 888–89 (2004) (quotation marks omitted). Due to the equitable nature of the doctrine, courts may consider other factors, including whether a party's prior inconsistent position was the result of "inadvertence or mistake." *Id.* at 30, 591 S.E.2d at 889 (internal quotation marks omitted).

47. Our courts have held that judicial estoppel may bar post-bankruptcy litigation when a debtor was required to, but did not, disclose relevant assets or legal claims during the bankruptcy proceeding. *See T-WOL Acquisition*, 220 N.C. App. at

204–05, 725 S.E.2d at 615; *Bioletti*, 204 N.C. App. at 276–80, 693 S.E.2d at 695–98.

This is consistent with decisions of numerous federal courts. *See, e.g., Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 204–05 (5th Cir. 1999); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419–20 (3d Cir. 1988).

<u>1. Whether At-Net Has Taken Clearly Inconsistent Positions</u>

48.    At a minimum, judicial estoppel requires a showing that a party has taken clearly inconsistent positions in the same or related litigation. *See Whitacre*, 358 N.C. at 29, 591 S.E.2d at 888–89. In this context, the question is whether At-Net concealed information from the bankruptcy court about assets and potential claims that are the subject of its counterclaims in this suit.

49.    The disclosure obligations of a Chapter 11 debtor are substantial. *See* 11 U.S.C. §§ 521, 1125. Among other things, the debtor must file a schedule of assets and liabilities, a schedule of current income and expenditures, and a statement regarding anticipated changes in income or expenditures for the 12-month period after the filing of the petition. *See* 11 U.S.C. § 521(a)(1). The debtor must also disclose existing legal claims and "any litigation likely to arise in a non-bankruptcy context." *Medicare Rentals, Inc. v. Advanced Servs.*, 119 N.C. App. 767, 770, 460 S.E.2d 361, 364 (1995). The duty of disclosure "is a continuing one." *Browning Mfg.*, 179 F.3d at 208 (citation and quotation marks omitted).

50.    In a Chapter 11 proceeding, the disclosure obligation ties directly to the debtor's reorganization plan, which "is basically a court-approved contract between the debtor and its creditors." *Friday Invs., LLC v. Bally Total Fitness of the Mid-Atl.,*

*Inc.*, 803 S.E.2d 233, 240 (N.C. Ct. App. 2017) (citing *In re WorldCom, Inc.*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006)). For the system to work as intended, the creditors and the bankruptcy court must have sufficient information to evaluate the plan. The Bankruptcy Code therefore requires the debtor "to file a disclosure statement providing 'adequate information' in which a hypothetical investor could make an informed judgment about the proposed reorganization plan." *Medicare Rentals*, 119 N.C. App. at 770, 460 S.E.2d at 364 (quoting 11 U.S.C. § 1125(b)). "Adequate information" broadly means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor" to enable an informed judgment, though balanced by considerations of the "complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." 11 U.S.C. § 1125(a)(1).

51. Confirmation brings the process to a close. "Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval." *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). The bankruptcy court's jurisdiction extends only to "matters pertaining to the implementation or execution of the plan." *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).

52. According to IFab, these obligations required At-Net to disclose the unbilled EDI support services as well as its May 2016 agreement to cap IFab's weekly bills and defer any excess. IFab contends that At-Net instead concealed this information, while falsely reporting that it was operating its business in the ordinary course and

also understating the amounts that would be available to creditors under its plan. At-Net responds that deferred billings were not unusual, depending on the type of work being performed, and that its filings were accurate based on the knowledge it had at the time they were made.

53. The timeline matters here. At-Net could not have disclosed any deferred billings when it filed its initial schedules in January 2015 because there was nothing to disclose. The unbilled services did not begin until roughly six months later. (*See* Aff. Alexander ¶ 15, Ex. 1.3; Aff. Bingham ¶ 9.) At-Net's initial bankruptcy filings are therefore not inconsistent with its position in this action, and IFab does not argue otherwise.

54. Nor is there any clear inconsistency in later filings. IFab points to the joint disclosure statement, in which At-Net represented to the bankruptcy court that it would have $69,609 and $45,882 available for its unsecured creditors in 2015 and 2016, respectively. (Aff. Alexander Ex. 1.12 at Ex. D.) IFab contends that these predictions are inconsistent with At-Net's current position that "IFab owes it $137,000 for work it performed in 2015 and $353,000 for 2016 work." (Br. Supp. 17.)

55. When the joint disclosure statement was filed, though, At-Net had accrued less than $20,000 in deferred billings for IFab. (*See* Aff. Alexander ¶ 15.) There is no evidence showing that At-Net knew, at that time, that the deferred billings would continue indefinitely, much less that they would eventually grow to nearly half a million dollars. (Br. Resp. 19; Aff. Alexander ¶ 15; Am. Aff. Berman ¶ 38.) At-Net's affidavits suggest that the company thought the situation was a "short-term

arrangement," one that would conclude when IFab hired a new IT employee. (Am. Aff. Berman ¶ 27.)

56. Furthermore, the joint disclosure statement's projections are just that—projections. At-Net calculated the anticipated available funds for 2015 and 2016 based on "historical results" and not "a client-by-client analysis of anticipated sales in future years." (Br. Resp. 18; *see also* Am. Aff. Berman ¶ 40.) The joint disclosure statement warns that actual results may differ from the estimates for any number of reasons. (*See* Aff. Alexander Ex. 1.12 at Ex. D.) A projected amount of revenue based on historical results and accompanied by a disclaimer is not clearly inconsistent with At-Net's later assertion of amounts owed based on actual billings.

57. IFab also argues that the deferred billings contradict At-Net's representation that it was operating its business normally. Determining what is normal and what is unusual are fact-intensive questions. Some evidence suggests that At-Net normally delayed billings for complex work until that work was completed, including for clients other than IFab. (*See* Am. Aff. Berman ¶¶ 19–24, 29–32, Exs. B–H .) This is supported by the fact that At-Net actually billed IFab for over $600,000 in 2015, apparently for more routine services. (Am. Aff. Berman Ex. K.) It is reasonable to infer that At-Net viewed its EDI support services in 2015 as a normal, temporary uptick in complex bills for a major client. (*See* Br. Resp. 4; Am. Aff. Berman ¶ 38, Ex. K.)

58. At-Net acknowledges that it came to view the relationship with IFab differently in 2016. Service requests surged, and in May 2016, At-Net agreed to cap

IFab's bills at $2,000 per week and to defer any excess. (Br. Supp. 3, 18; *see also* Countercl. ¶¶ 6–11; Am. Aff. King ¶¶ 7–9, Exs. A, B, ECF No. 47.15.) Although IFab contends that At-Net should have disclosed this agreement, it arose after confirmation, at a time when At-Net was free to carry on its business without supervision by the bankruptcy court. (*See* Br. Supp. 18; Br. Resp. 14–15; Aff. Alexander Ex. 1.23 at Ex. A, § 9.1.) There is no evidence that this agreement existed before plan confirmation, and it does not appear that At-Net had any duty to disclose it to the bankruptcy court. (*See* Br. Resp. 14–15; Aff. Alexander Ex. 1.23 at Ex. A, § 9.1.) In the absence of a post-confirmation duty of disclosure, At-Net's failure to disclose this information to the bankruptcy court is not inconsistent with its efforts to seek recovery in this action. *See In re Grinstead*, 75 B.R. 2, 3 (Bankr. D. Minn. 1985) (noting that a debtor lacks fiduciary obligations post-confirmation because "[t]here is no debtor in possession status of a debtor post confirmation" and "[t]he rights and duties of creditors and the debtor are determined by the confirmed Chapter 11 plan"); *see also Dynasty Oil & Gas*, 540 F.3d at 355; *Bank of La.*, 266 F.3d at 390; *Pettibone Corp.*, 935 F.2d at 122.

59. In addition, the evidence does not suggest that At-Net was aware, before confirmation, that it may have a potential legal claim against IFab. There is no indication that IFab had refused payment, and one of its own witnesses states that the company would have paid any legitimate invoices in a timely manner. (Aff. Bingham ¶ 14.) At-Net surely knew of a potential claim in December 2016 (when IFab first refused payment), and it may have known of a potential claim as of August

2016 (when it realized IFab likely would not cover its growing balance). But its duty of disclosure had long ended by either date.

60. Perhaps there is a point at which the deferred EDI support billings became sufficiently large and sufficiently abnormal to require At-Net to amend its disclosures. The accrued amounts eclipsed the $100,000 mark before plan confirmation and then accelerated through the end of 2016. (*See* Aff. Alexander ¶ 15, Ex. 1.23.) At-Net certainly had some knowledge that something was amiss during the months before and after the confirmation order.

61. On the current record, though, IFab has not carried its burden to show that At-Net's failure to disclose the deferred billings, based on its knowledge at the time, is clearly inconsistent with the allegations supporting its counterclaims. Judicial estoppel is a "harsh doctrine" to be applied with caution. *Medicare Rentals*, 119 N.C. App. at 771, 460 S.E.2d at 364. And the federal courts have not adopted a clear rule defining a debtor's obligation to report fluctuations in asset values or projected revenues. *See, e.g.*, *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 996 (10th Cir. 2014) ("It appears to be a minority view that in a bankruptcy proceeding, debtors have a continuing duty to disclose changes in an asset's value."). The Court cannot conclude, as a matter of law, that At-Net knowingly withheld material information that it had a duty to disclose or that it knowingly deferred IFab's bills to shield them from the bankruptcy court and its creditors.

## 2. Other Equitable Considerations

62. The absence of a clear inconsistency is a sufficient basis, standing alone, to deny IFab's motion for summary judgment. *See T-WOL Acquisitions*, 220 N.C. App. at 201, 725 S.E.2d at 613 (citing *Estate of Means v. Scott Elec. Co.*, 207 N.C. App. 713, 718–19, 701 S.E.2d 294, 298–99 (2010)); *see also Whitacre*, 358 N.C. at 29 n.7, 591 S.E.2d at 888 n.7. Even if that were not the case, several other equitable considerations weigh against the entry of summary judgment.

63. First, although the Court "is not obliged to specifically determine that the party to be estopped intended to mislead the court by its representations in the later action," intent is a relevant consideration. *Whitacre*, 358 N.C. at 32, 591 S.E.2d at 891. The evidence regarding At-Net's motive to conceal assets from the bankruptcy court is at best a mixed bag.

64. In mid-2015, At-Net's proposed plan of reorganization allocated net profits for the years 2016 to 2018 to At-Net's unsecured creditors, but exempted profits from 2015. (*See* Br. Resp. 21; Aff. Alexander Ex. 1.11 at pp.9–11.) In other words, deferring revenues into future years would have been costly for At-Net but beneficial to creditors. By the same token, due to the legal expenses associated with its bankruptcy, At-Net had an incentive to "realize revenues at that time." (Br. Resp. 21.) Taken together, this evidence suggests that At-Net would have been motivated to *accelerate* payment for its services in 2015, not to defer payment.

65. IFab argues that the confirmed plan differs from the proposed plan in ways that suggest the opposite motive. (*See* Reply 9–10; *see also* Aff. Alexander Exs. 1.9,

1.11, 1.20–21, 1.23.) At-Net reached settlements with two of its creditors, agreeing to fixed payments rather than a percentage of net profits. Arguably, At-Net had a motive to understate its financial position during these negotiations. This conflicting evidence concerning At-Net's intent weighs against the imposition of judicial estoppel on summary judgment.

66. Second, it is far from clear that At-Net would derive an unfair advantage if allowed to pursue its counterclaims. More than half of the amounts At-Net seeks to recover accrued for work performed post-confirmation. (*See* Br. Supp. 5; Aff. Alexander ¶ 15.) As noted, there is no evidence to show that At-Net knew in 2015 that it would perform hundreds of thousands of dollars in complex EDI support services the next year. It would be inequitable to prevent At-Net from seeking recovery for those services at a time when it had no obligation to disclose them to the bankruptcy court and was free to operate its business without judicial supervision.

67. On the other hand, dismissing At-Net's counterclaims could harm some of its creditors, which continue to hold an interest in At-Net's net after-tax income between 2016 and 2018. In similar situations, some courts have declined to invoke judicial estoppel when doing so would prevent creditors from obtaining a share of the recovery in a meritorious claim asserted by the former debtor. *See, e.g.*, *Diamond Z Trailer*, 371 B.R. at 421 (noting that estoppel may result in creditors being "doubly punished: first when the asset is omitted; and, second, when there is an estoppel from pursuing the asset"); *Richardson v. UPS*, 195 B.R. 737, 739 (E.D. Mo. 1996) (declining to apply judicial estoppel pre-confirmation to a debtor who omitted an asset from its

schedule because "creditors would be penalized if the Court were to dismiss the claim").

68. It also bears noting that, had At-Net actually billed IFab in 2015 for all EDI support services performed that year, roughly 30 percent of the amount At-Net seeks in this lawsuit would have been exempt from the amounts made available to unsecured creditors through At-Net's net income for 2016 to 2018. (*See* Reply 9–10; Aff. Alexander ¶ 15, Exs. 1.11, 1.20–21, 1.23.) Thus, had At-Net billed as IFab contends it should have, it would have had less available for its creditors than it will if it prevails in this lawsuit.

69. Additional evidence may show that At-Net was "cooking the books," as IFab contends. (Reply 11.) Taken in a light most favorable to At-Net, however, the evidence suggests that At-Net had no motive to conceal information during its bankruptcy and that estopping At-Net from pursuing its counterclaims now would unfairly harm its creditors. *See Diamond Z Trailer*, 371 B.R. at 421. On balance, these equitable considerations further support the denial of summary judgment.

V.
CONCLUSION

70. For the foregoing reasons, the Court **DENIES** the motion to dismiss and **DENIES** the motion for partial summary judgment. The Court also **GRANTS** At-Net's motion to supplement the record and overrules IFab's objections to the affidavits offered by At-Net.

This the 9th day of May, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases